## ESTATE OF W. L. MOEHONUA, Deceased.

### In Probate.   Before Judd, C.J.

### June, 1882.

The presumption in favor of legitimacy of children born in wedlock, even though adultery be proven, must be held to apply to the ancient times in this country before marriage was introduced.

A claim of heirship, based on the alleged affiliation, by a chief, of a child whose mother habitually consorted with another man as her "kane," disallowed.

The Court distributes the estate of decedent among the claimants whose heirship is proven.

### Decision of Judd, C.J.

The late W. L. Moehonua died on the 8th of December, A.D., 1878. His property being considerably encumbered, the administrator was obliged to sell a large portion of the estate in order to pay the debts, and it was not until March, 1882, that the accounts were presented to the Court for approval and for distribution of the estate remaining.

At the hearing the following persons appeared as claimants: G. W. Keaweamahi and his sister Alapai (represented by

Kamika, her husband), who claim to be cousins of Moehonua, as children of Ialua (k.) and Keohoula (w.), Ialua being the brother of Napua, the mother of decedent. This is admitted to be true by all the claimants.

The claimant Moepali, who also calls himself W. L. B. Moehonua, claims to be a second cousin of decedent, as being the grandson of Kahaokamoku, a brother of Napua, Moehonua's mother. This claim is also not disputed.

Kekuaihe (k.), who claims to be a cousin of decedent, as being the son of Kaikuahine, who was the sister of Keaweamahi, Moehonua's father. This claim is disputed.

His Majesty Kalakaua, who claims the estate as being a nephew of decedent, the claim being that His Majesty's maternal grandfather Aikanaka, and not Keaweamahi, was the father of Moehonua. This claim is also disputed.

Moehonua left a widow named Kapeka, who afterwards married Keaweamahi, the first above-mentioned claimant, and died in 1881, leaving as her heirs-at-law her husband, and Kaailau, Keohokii, Kaepa and Komo, her brothers, and Kamahana, Kukuilau, sisters, and Nua a niece, and Lono, a nephew, children of a deceased sister named Kealoha.

One-half, therefore, of the estate of Moehonua descends, according to our statute, to the husband and heirs of Kapeka the widow, i.e., one-quarter of the whole estate to G. W. Keaweamahi as her husband, and 1-28th each to Kaailau, Keohokii, Kaepa and Komo, Kamahana, Kukuilau, and 1-56th each to Nua and Lono.

I take up first the claim of His Majesty, as the alleged relationship of nephew will, if sustained, take to the exclusion of cousins.

The claim is, in substance, that Napua, who was the woman with whom Keaweamahi habitually consorted, and this "Kane" or husband of hers, were "Kahuas" or family retainers of the High Chief Aikanaka. That on one occasion, the chiefs and people being engaged in cutting sandal-wood in the mountains in the northern portion of this island (1824-25), Aikanaka

cohabited with Napua, and the issue of this was Moehonua, the
decedent. His name (Moehonua) meant "sleeping on the
ground," from the circumstances of Aikanaka sleeping on the
ground at the time of the sandal-wood cutting. That certain
articles were given by Aikanaka as tokens of his acknowledg-
ment that the child was his. There are contradictions in the
testimony as to what these articles were. One witness, Ka-
wailiilii, says they were a malo (a man's loin cloth), two lei
palaoa (hair necklaces with a bone ornament pendant), one
named "Nakuloki" and the other "Kooai," and also a "Leio-
mano" (an instrument made of shark's teeth, to be worn on
the hand as an offensive weapon). Another witness (Manuka-
hunaaiole) says the tokens were a malo, a large kahili (black.
in color), and a "Leiomano." Kaawaloa says the kahili was a
white one. Kawailiilii assumed, in her examination before the
late Chief Justice Harris in 1880, to identify the two necklaces
and the "Leiomano" when produced by claimant. Kaawaloa
says the "Leiomano" was buried with Kaaua, the servant who
had charge of them, and that the kahili was put in the tomb
when Moehonua died. Members of the household say this kahili
was one Moehonua bought.

None of the witnesses examined before me speak of any lei
palaoa or necklace, and none of the witnesses examined in 1880
speak of a kahili as one of the tokens.

There are also contradictions as to when and where these
tokens were given. Keliiokahekili (w.), in 1880, says Aikanaka
gave them, the necklaces, to Kaaua, at Kaawaloa, Kona, Hawaii;
this must have been after the birth of Moehonua, for he was
born at Mokuleia, Oahu, as this witness says, and yet this wit-
ness says she saw Aikanaka give the malo and necklace to
Kaaua, and at another part of her testimony she says the malo
was given to Kaaua at the time of the cohabitation.

Another witness, Kalola, says Aikanaka told her that he gave
the tokens to Napua to signify that if she bore a child it would
be his, indicating that the tokens were given before the birth of
Moehonua.

But if it be conceded that the proofs are reasonably clear that Aikanaka did have intercourse with Napua, and certain tokens were deposited either then or at the birth, this can mean no more than to indicate his (Aikanaka's) belief that he was the father of the child. It was proved that this woman was not tabued and kept separate after her meeting with Aikanaka. It was also in proof that she continued to live with her husband, and though Aikanaka may have thought that Moehonua was his child there is no certainty that he was.

The policy of the law at present is in favor of legitimacy, and the rule exists that the presumption is in favor of the legitimacy of offspring born in wedlock even though adultery may be proven. I think this same rule must be held to apply to the times in this country before Christian marriage was introduced. I do not understand that there ever was in these islands a system which was nothing more than mere promiscuous and indiscriminate intercourse between the sexes. That polygamy existed among the chiefs is a matter of history, and this Court recognized this in one of the cases in the matter of the estate of Kanaina (July term, 1878). But while a man might have more than one woman consorting with him, there was a certain degree of permanency in this relation, and so a woman was commonly known as the "wahine" or wife of a certain man, and it by no means follows that the offspring born after a chance meeting of a man and a woman, the man not being the "kane" or husband of the woman, would or could be considered as the offspring of that casual connection. Moehonua was not considered as a chief or anything like the rank of Aikanaka.

The legend of "Umi or Liloa" is referred to by claimant's counsel as a parallel case. But here Umi presented the tokens (which had been deposited with his mother Akahiameainoa) to his putative father Liloa, who was King of Hawaii, and secured his full and complete recognition as his son. These were personal characteristics of Umi that left no doubt in the minds of any that he was the son of Liloa, and the public proclamation was equivalent to an adoption of Umi as his son. This element

does not exist in the case before us, for the tokens were not presented by Moehonua to Aikanaka, nor was his recognition secured; in fact, there is no proof that Moehonua was aware of the existence of the tokens.

To adopt the view of the claimants' counsel would throw the inheritance of native Hawaiians into inextricable confusion.

Every witness who was questioned upon this point says that the "kane" of Napua was Keaweamahi. From this Keaweamahi, Moehonua inherited, as his son and heir, the large land of Pulehunui, on Maui, the use of which he enjoyed for many years, and which was sold to pay the debts of this estate.

I feel obliged to hold that Moehonua was not the legitimate son of Aikanaka, therefore the claimant is not entitled to inherit this estate.

The claim of Kekuaihe is next to be considered. Not many witnesses were offered in support of his claim, but I think those that were examined are entitled to credence.

They say that Kaikuahine (k.) was a brother of Keaweamahi, and by Kahiko had this claimant. This branch of the family lived at Hilo, and the fact that witnesses who lived at Kona and on Oahu never heard of the relationship, is not conclusive against its credibility.

I think his claim is established and distribute the remaining estate as follows:—

One-twelfth to G. W. Keaweamahi (k.)
One-twelfth to Alapai (w.)
One-sixth to Kekuaihe (k.)
One-sixth to W. L. Moehonua, alias Moepali.

And, as above indicated,

One-fourth to G. W. Keaweamahi.
One-twenty-eighth to Kaailau.
One-twenty-eighth to Keohokii.
One-twenty-eighth to Kaepa.
One-twenty-eighth to Komo.
One-twenty-eighth to Kamahana.
One-twenty-eighth to Kukuilau.

One-twenty-eighth to Nua and Lono.

*J. M. Davidson,* for Keaweamahi and the heirs of Kapeka, *J. L. Kaulukou* with him.

*R. F. Bickerton,* for Moepali.

*F. M. Hatch,* for His Majesty.

*I. Nawali & W. L. Holokahiki,* for Kekuaihe.

Honolulu, June 16th, 1882.