# STATE OF HAWAII *v.* HAWAIIAN DREDGING COMPANY, ET AL., AND JUE ANAMI, DAVID KAKALIA, KOMAYE OISHI, ET AL.

Nos. 4277, 4347.

November 27, 1964.

Tsukiyama, C. J., Cassidy, Wirtz, JJ., Circuit Judge
Okino in Place of Lewis, J., Disqualified,
and Circuit Judge Jamieson in Place
of Mizuha, J., Disqualified.

OPINION OF THE COURT BY WIRTZ, J.

On August 29, 1941, the Territory of Hawaii instituted a condemnation action in aid of the Keehi Lagoon transpacific seaplane harbor.

The area under condemnation was the sea fishery of Mokauea in Keehi Lagoon. When the action was filed the Territory alleged that the only outstanding private rights in the area were fishing rights and ownership of Kahakaaulana Island (L.C.A. 10611 to Puhene) in the fishery. However, defendant Hawaiian Dredging Company, Limited, claimed not only the fishing rights as the konohiki

of the fishery but also the fee simple title to the submerged land in the fishery.[1] The petition was accordingly amended to seek condemnation of the island and of all private rights in the fishery, whatever such rights might be.

None of the Intervenors-Appellants appeared in the case or asserted any rights in the area under condemnation until 1947.[2] Others did not appear until 1951, ten years after the action was commenced.[3] All Intervenors claimed to own undivided interests in the fee simple title to the submerged land and the konohiki fishing rights, claimed by Hawaiian Dredging Company, Limited. Their claims were based upon inheritance from W. L. Moehonua, the awardee of L.C.A. 6450, Apana 1, to which the sea fishery of Mokauea was appurtenant, and upon mesne conveyances from Moehonua's heirs.

During the course of the litigation the Territory made a settlement with the owners of Kahakaaulana Island and obtained a deed. Judgment was entered which in effect quieted title to the island. This judgment was not appealed and disposed of one of the multiple claims in the case.

While the Territory disputed all claims to ownership of submerged land in the fishery, it recognized Hawaiian Dredging Company, Limited, as the owner of the konohiki fishing rights. A settlement with Hawaiian Dredging was effected, by which the Territory, under an exchange deed, acquired all of the rights of that company in the remaining area under condemnation, whatever those rights might

---

[1] This claim was based on the judgment secured by Kapiolani Estate, Limited (predecessor in title to Hawaiian Dredging Company, Limited) in Law No. 5123. First Circuit Court, entitled *"Kapiolani Estate, Limited v. Territory of Hawaii."* This judgment and its effect is discussed at length later in the opinion.

[2] November 15, 1947, Answers of Intervenors Jue Anami and David K. Kakalia filed.

[3] August 14, 1951, Answer of Intervenors Kainuma, Oishi, et al., filed.

be. See, *Territory* v. *Hawaiian Dredging Co.*, 42 Haw. 627.

The case, then in the nature of an action to quiet title, remained at issue between the Territory (which shortly thereafter attained statehood) and the Intervenors on the issues of whether the Intervenors owned any interests in the area under condemnation. At pre-trial proceedings it was determined, because of its greater importance, that the Intervenors' claims to ownership of submerged land within the fishery be first ascertained before considering their claims to ownership of fishing rights. It is from the judgment entered in favor of the State and denying Intervenors' claims to the submerged land on this issue on July 11, 1961, that the Intervenors have appealed in No. 4277.[4]

Thereafter, Intervenors' claims of ownership of konohiki fishing rights within the fishery came on for trial pursuant to the pre-trial order. Again, judgment[4] was entered in favor of the State denying Intervenors' claims, from which Intervenors have appealed in No. 4347.

Preliminarily, we should consider and dispose of Intervenors' Motions to Dismiss for Lack of Jurisdiction in Lower Court filed in this court in both Nos. 4277 and 4347 on November 30, 1963. After the hearing on these motions on December 20, 1963, their disposition was taken under advisement. The attack on jurisdiction is based on the affidavit of counsel for Intervenors attached to the motions, wherein he deposes: "That Respondents-Appellees, Hawaiian Dredging Company, Limited, filed on December 7, 1951, a motion for dismissal for want of prosecution of eight years * * *." He further deposed that no ruling, order or disposition of the motion to dismiss was made by the trial court.

In support of their motion, Intervenors invoke the

---

[4] The judgment below was a final judgment on one of a number of multiple claims, entered pursuant to H.R.C.P., Rule 54(b).

provisions of R.L.H. 1955, § 231-4,[5] and contend that its provisions are mandatory and self-executing with the trial court automatically losing jurisdiction of the subject matter. They "urge that the cause of action be dismissed for lack of jurisdiction to proceed after November 19, 1947 [six years from November 19, 1941, the date of Hawaiian Dredging Company, Limited's answer to original complaint of August 29, 1941] and that the parties be left to other remedies at law."

Before this court can even begin to consider Intervenors' motions requesting that all proceedings herein since 1947 (or at least since 1951 or 1952) be declared nullities for lack of jurisdiction, it must first find as an evidentiary fact that Hawaiian Dredging Company, Limited did file the claimed Motion for Dismissal for Want of Prosecution and that circumstances warranting a dismissal under the provisions of R.L.H. 1955, § 231-4, did exist with respect to this action.

There is no basis in the records on these appeals warranting this court to make any of the required findings, nor does any such basis appear in the records of the two previous interlocutory appeals, Nos. 2927 and 4003.[6] While this court may, if it desires, take judicial notice of the cases formerly or now before it,[7] it may not inform itself concerning the record of the trial court by judicial notice. Both statute and rule permit consideration of a

---

[5] The pertinent provisions of R.L.H. 1955, § 231-4, which was in force at the time involved as R.L.H. 1945, § 10104, are as follows:

"* * * A cause remaining untried for a period of six years after it has been placed on the calendar, without action of the defendant to delay or postpone trial, shall stand dismissed with prejudice for want of prosecution without the necessity of entering any order of dismissal."

[6] No. 2927 was an appeal from the denial of a motion to disqualify E. C. Peters as attorney for Intervenors. Dismissed as moot January 23, 1956.

No. 4003 was an appeal from the denial of a motion to amend the petition. See 42 Haw. 627.

[7] *Soga* v. *Jarrett*, 20 Haw. 120, 122.

record of the trial court on appeal only to the extent that it is duly offered under proper certificate and seal. R.L.H. 1955, § 224-14; H.R.C.P., Rule 75(g).

Rule 75(a) of the Hawaii Rules of Civil Procedure requires that upon taking an appeal the appellant promptly file in the trial court "a designation of the portions of the record, proceedings, and evidence to be contained in the record on appeal." Rule 75(g) provides that only the matters so designated by the parties shall constitute the record on appeal, with the exception of certain automatic pro forma inclusions, such as material pleadings, verdict and the like.[8]

None of the Designations of Contents of Record on Appeal, the Additional or Supplementary Designations, filed by Intervenors, and the Indices to Record on Appeal filed and certified by the circuit court clerk, designates, lists or mentions the Motion for Dismissal for Want of Prosecution now relied upon by Intervenors. Neither do any of those Designations, Supplements to Record and Indices identify or include any documents, papers or proceedings whereby it can be established that circumstances warranting dismissal of the action under the provisions of R.L.H. 1955, § 231-4, were ever present in the case.

Petitioner-Appellee did not file any Designations.

Clearly, neither the Motions for Dismissal for Want of Prosecution, allegedly filed by Hawaiian Dredging Company, nor the facts warranting dismissal under R.L.H. 1955, § 231-4, are within the classes of documents

---

[8] H.R.C.P., Rule 75(g) states in part:

"* * * Only the matter designated by the parties when transmitted by the clerk constitutes the record on appeal, but the record on appeal shall always include, whether or not designated, the following: the material pleadings without any unnecessary duplication; any verdict or findings of fact and conclusions of law together with any direction for the entry of judgment thereon; any master's report; any opinion; the judgment or part thereof appealed from; the notice of appeal with date of filing; the designation or stipulations of the parties as to matter to be included in the record; and any statement by the appellant of the points on which he intends to rely."

automatically made part of the record under the above-quoted provisions of H.R.C.P., Rule 75(g).[9]

In short, the underlying material essential to consideration of Intervenors' own motions before this court is not part of these records on appeal.

Rule 6(a) of the rules of this court is mandatory in stating that "no facts will be considered unless shown by the record or affidavit." The affidavit of counsel attached to Intervenors' motions hardly cures the basic defects in the record. In its reference to documents filed in the trial court or in prior appeals in this court, it is not the best, as certainly it is incomplete evidence. The affidavit amounts to no more than a statement of conclusions and argument. It is elementary that an appellant must furnish to the appellate court a sufficient record to positively show the alleged error. *Marn* v. *Reynolds*, 44 Haw. 655, 663, 361 P.2d 383.

We would be inclined to dismiss Intervenors' motions but for the fact of counsel's late entrance into the case on appeal and further that acceptance of the facts set forth in his affidavit at face value avail him little when the motions are considered on their merits.

In effect, Intervenors' contention under their motions to dismiss is that the dismissal provisions within the second sentence of R.L.H. 1955, § 231-4 (quoted above in footnote 5) operate, upon the happening of the events stated therein, to oust the trial court of jurisdiction over the subject matter of the cause.

We cannot so view it. It takes but little reflection to perceive the absurdity that would result in cases where multiple defendants, not acting in concert, were involved. Even in this case, the first of the Intervenors filed their answers on November 15, 1947, a bare four days before the trial court allegedly lost jurisdiction of the cause and

---

[9] See footnote eight, *ante.*

four years before the Motion for Dismissal for Want of Prosecution was filed by Hawaiian Dredging Company, Limited. The remaining Intervenors did not enter the case until August 14, 1951, after the trial court was supposedly without jurisdiction and but four months prior to the motion for dismissal. To accept Intervenors' construction would impugn the intelligence of the legislature and could strain the constitutionality of the legislative act as well insofar as due process is concerned.

This court has intimated in *Arnold* v. *City and County*, 45 Haw. 165, 167, 363 P.2d 968, that the dismissal provision in R.L.H. 1955, § 231-4, might well be a procedural matter and rendered ineffective upon the adoption of appropriate rules covering same under the powers conferred by Article V, Section 6 of the Constitution for the State of Hawaii. Chapter 231 is within Title 28 of the Revised Laws of Hawaii entitled "Pleadings and Procedure." The entitlement of Chapter 231 is "Court Trials," and the subdivision of that chapter containing section 231-4 is headed "Calendar." The first section of the "Calendar" subdivision, R.L.H. 1955, § 231-1, grants authority to courts of record to make rules for the guidance of their clerks in making up trial calendars. All of the other sections in that subdivision deal with the timing and manner of disposition of cases on the trial calendars. Within section 231-4 itself, the first sentence covers advancement or postponement of cases on the trial calendar. It would indeed seem incongruous for the legislature to insert, within this framework, a provision governing trial courts' jurisdiction over the subject matter of cases pending before them.

Further, Act 117, S.L. 1937, which enacted the dismissal provision now in R.L.H. 1955, § 231-4, was entitled "An Act to Amend Section 4106 of the Revised Laws of Hawaii 1935, Relating to the *Order* of Trial Cases"

(emphasis added). Subsequent acts further amending that section contained titles showing amendments to "Section 4106 * * *, Relating to the Trial of Cases in the Circuit Courts."[10] Neither the act by which the dismissal provision was enacted nor any of the subsequent acts amending other portions of that section expressed in their titles the fact that jurisdiction of the trial courts was affected. Those acts could hardly have been intended to affect jurisdiction over the subject matter in limitation of the trial courts' jurisdiction. Organic Act, § 45; *Hawaii Const.*, Art. III, § 15.

The cases relied on by Intervenors are of little help. No one takes issue with the proposition advanced by *Boeing Airplane Co.* v. *Board of County Comm'rs,* 164 Kan. 149, 188 P.2d 429, that jurisdiction of the subject matter can be questioned on appeal. *Davant* v. *Coachman Properties,* 118 So. 2d 844 (Fla. 1960), deals with a statute utterly dissimilar to our own. The earlier California cases of *Henderson* v. *Palmer Union Oil Co.,* 64 Cal. App. 81, 220 Pac. 672 and *Christin* v. *Superior Court,* 9 Cal.2d 526, 71 P.2d 205, granted "mandatory" dismissals under the provisions of section 583 of the California Code of Civil Procedure. However, the more recent California cases have construed that section to be merely a procedural provision, that expiration of the five-year period therein provided does not deprive the court of jurisdiction and that a party may be barred from claiming the benefit of the limitation. *In re Thatcher's Estate,* 120 Cal. App. 2d 811, 262 P.2d 337; *Bayle-Lacoste & Co.* v. *Superior Court,* 46 Cal. App. 2d 636, 116 P.2d 458.

Be that as it may, the most that can be said of R.L.H. 1955, § 231-4, is that it affects merely the court's jurisdiction over the parties. Lack of jurisdiction over a party

---

[10] Act 145, S.L. 1939 and Act 56, Sp. S.L. 1941.

being a personal matter may be waived. *Kaui* v. *County of Kauai*, 47 Haw. 271, 386 P.2d 880. It can be given no greater effect than is given to statutes of limitation barring the prosecution of stale claims, the defense of which is waived by a failure to plead same. H.R.C.P., Rules 8(c), 12(b) and 12(h); *Borba* v. *Kaina*, 22 Haw. 721.

Intervenors' extensive participation in the case subsequent to 1952, including their substitution of successors in interest for Intervenors who had died, answering the second amended petition in 1958, framing issues for trial through pre-trial proceedings on May 26, 1961, engaging in trial on the merits and appealing adverse judgments certainly precludes any claim of lack of jurisdiction over the persons of Intervenors. Further, at no time during all of their participation in the case did Intervenors raise the limitations defense now raised under their Motion to Dismiss for Lack of Jurisdiction in Lower Court. The motions must be denied.

*Bayle-Lacoste & Co.* v. *Superior Court, supra,* 46 Cal. App. 2d 636, 116 P.2d 458, involved a fact situation similar to our own. There, numerous defendants in a condemnation action were cited in by fictitious names. A corporation appeared late in the case, after expiration of the five-year period, and asserted a claim. Later, however, it attempted to have the action dismissed on the ground that it had not come to trial within the statutory period. The court refused to condone this conduct, stating: "Litigants should not be permitted to inject themselves into a controversy, raise issues therein and then change position and seek to avoid a contest." 116 P.2d 458, 464.

We now consider the appeal in No. 4277 on its merits. It is clear that the Intervenors' claims to ownership of land within the fishery depend upon their construction being put upon L.C.A. 6450, Apana 1, to Moehonua. The

issue under this appeal turns solely upon the scope of that award.

Land Commission Award 6450 encompassed 10 apanas (parcels of land). Apana 1 embraced the Ili of Mokauea,[11] consisting of kula (dry) land, fishponds and a sea fishery. In Volume 6 of the Land Commission Awards there are two descriptions and diagrams of Apana 1. One of the descriptions is set forth on page 486, with the diagram thereof at page 488, and the other, with accompanying diagram, is set forth on page 769. The description at page 486 is crossed out and both on that page and in the diagram on page 488 there are notations referring to the description and diagram on page 769 as being the correct one.

The description and diagram at pages 486 and 488[12] included part of the sea of Mokauea, that is, an area of approximately 199 acres makai (seaward) of the fishpond walls. In the corrected description and diagram at page 769, this area in the sea was omitted, the makai boundary of the Apana being limited to direct azimuths and distances along the fishpond walls.

The submerged land area omitted from the second description at page 769 is the area, claimed by Hawaiian Dredging Company, Limited,[13] in which the Intervenors claim individual interests in fee simple. They contend that the description and diagram at pages 486 and 488 control, to the exclusion of the description and diagram at page 769. The State contends that only the land described and depicted at page 769 was awarded, that title to the sea bottom makai of the fishpond walls remained in the Hawaiian government, and that the original awardee and his successors in interest had only konohiki

[11] A portion of land similar to an ahupuaa only smaller and usually awarded to a lesser chief (nobility).

[12] The survey resulting in this description appears to have been defective as it would not close.

[13] See footnote one, ante.

fishing rights[14] in the area makai of the fishpond walls. The judgment[15] entered in the trial court and appealed from in No. 4277 upheld the contention of the State.

Initially, Intervenors claim that the scope of L.C.A. 6450, Apana 1, has been judicially determined in *Kapiolani Estate, Limited* v. *Terriotry of Hawaii, supra,* Law No. 5123, First Circuit Court and that the judgment entered therein is res judicata of the issue herein presented in No. 4277. In this connection they specify as error the finding of the trial judge "that the judgment in Law No. 5123 * * * was not a binding precedent on the scope of the award made by the Land Commission Award 6450, Apana 1."

By way of explanation of the background of this judgment it seems appropriate to digress for the purpose of reviewing some of the history of this award to Moehonua. During the course of administration of Moehonua's estate, the Ili of Mokauea and Moehonua's other remaining property had been subdivided and sold. King Kalakaua purchased the Ili of Mokauea which subsequently passed by mesne conveyances to Kapiolani Estate, Limited. After passage of the Organic Act, Kapiolani Estate filed proceedings in the circuit court, as permitted by Section 96[16]

---

[14] Those held by the owner of the ili or ahupuaa (the land to which the fishery is appurtenant).

[15] See footnote four, *ante.*

[16] *"Proceedings for opening fisheries to citizens.* That any person who claims a private right to any such fishery shall, within two years after the taking effect of this Act, file his petition in a circuit court of the Territory of Hawaii, setting forth his claim to such fishing right, service of which petition shall be made upon the attorney-general, who shall conduct the case for the Territory, and such case shall be conducted as an ordinary action at law.

"That if such fishing right be established, the attorney-general of the Territory of Hawaii may proceed, in such manner as may be provided by law for the condemnation of property for public use, to condemn such private right of fishing to the use of the citizens of the United States upon making just compensation, which compensation, when lawfully ascertained, shall be paid out of any money in the treasury of the Territory of Hawaii not otherwise appropriated." 48 U.S.C.A. 507.

of the Organic Act, to preserve the konohiki fishing rights, which otherwise would have expired under the terms of Section 95[17] of the Act. In an amended petition filed in those proceedings, Kapiolani Estate claimed not only the konohiki fishing rights in Mokauea, but also fee simple ownership of the soil under a portion of the fishery (the submerged land here involved). The claim to ownership of this submerged land was based upon the description of Apana 1 at page 486 of Volume 6. The judgment entered in the case confirmed the ownership of the konohiki fishing rights in Kapiolani Estate and also purported to adjudicate that the Estate was the owner of all of the premises described in the earlier description of Apana 1, that is, the description set forth, and crossed out, at page 486 of Volume 6 of the Land Commission Awards.

Although no appeal was taken from this judgment in Law No. 5123, the State contends that this judgment was void, for lack of jurisdiction, insofar as it purported to establish fee simple title to the submerged land in question. It should be noted that the State's chain of title through Hawaiian Dredging Company, Limited (successor in interest to Kapiolani Estate, Limited), includes whatever Kapiolani Estate owned in the area under condemnation, and extends back to Moehonua through the deed made by his estate to Kalakaua. Intervenors' claim, on the other hand, is adverse to the claim of Kapiolani Estate, it being Intervenors' contention that the submerged land area of Apana 1 was not conveyed to Kalakaua (contrary to the judgment in Law. No. 5123) but remained in the

[17] "*Repeal of laws conferring exclusive fishing rights.* That all laws of the Republic of Hawaii which confer exclusive fishing rights upon any person or persons are hereby repealed, and all fisheries in the sea waters of the Territory of Hawaii not included in any fish pond or artificial inclosure shall be free to all citizens of the United States, subject, however to vested rights; but no such vested right shall be valid after three years from the taking effect of this Act unless established as hereinafter provided." 48 U.S.C.A. 506. (See footnote 16, *ante.*)

heirs of Moehonua, under whom they claim.

This, then, is the basis for Intervenors' contention that the State was precluded in the trial court from again litigating the issue as to which of the two descriptions of Apana 1 correctly describe the land awarded by the Land Commission in L.C.A. 6450, Apana 1.

In support of this contention Intervenors have cited authority stating the principles of res judicata. *Holelua v. Kapu,* 5 Haw. 305, 306; 30A Am. Jur., *Judgments,* § 371, pp. 411-415. That authority recites the well known limitations that the doctrine of res judicata applies only as between the parties to the earlier action or their privies and only insofar as the court rendering the judgment had jurisdiction of the parties and the subject matter. See also, *Glover* v. *Fong,* 42 Haw. 560, 573, and *Makainai* v. *Lalakea,* 29 Haw. 482, 485.

In this action the State of Hawaii is privy to both parties to Law No. 5123, being Kapiolani Estate, Limited's successor in title and the Territory's successor in title and in sovereignty. The Intervenors, on the other hand, are privy to neither of the parties in Law No. 5123.

Furthermore, the circuit court in Law No. 5123 had no jurisdiction to adjudicate anything but the extent and ownership of fishing rights. Sections 95 and 96 of the Organic Act (set out in footnotes 16 and 17, *ante*) established a special type of statutory proceeding in eminent domain for public acquisition of all vested private fishing rights in sea fisheries. Section 96 conferred jurisdiction on the circuit court to hear the initial step in each proceeding, that is, the establishment of ownership of the fishing rights and of the boundaries of the fishery. *Bishop* v. *Mahiko,* 35 Haw. 608. No general jurisdiction was conferred upon the circuit court by that section. Furthermore, actions thereunder to establish fishing rights were not actions to quiet title. *Kapiolani Estate* v. *Territory,*

18 Haw. 460 (involving a Hanapepe River fishery). Kapiolani Estate invoked this special jurisdiction in its complaint and amended complaint in Law. No. 5123. Consequently, the circuit court was restricted to the exercise of that special statutory jurisdiction, which did not include power to adjudicate title to the submerged land in question.

Intervenors seem to have maneuvered themselves into a rather untenable position. In invoking this judgment in the Mokauea fishery registration case as res judicata of the boundaries of Apana 1 to include the submerged land of a portion of the fishery they perforce are confronted with the determination in that judgment, also res judicata under their theory, that ownership in fee simple of that submerged land in question is in the State's predecessor in interest, Kapiolani Estate, adverse to their claim.

It becomes unnecessary to consider at length the question whether this judgment in Law No. 5123 is binding upon the parties in the present action as a matter of precedent rather than as res judicata. Intervenors in their reply brief have insisted that "the question presented is not one of stare decisis but one of res judicata." In any event, the judgment in Law No. 5123 was a single decision entered by the judge of a coordinate court lacking jurisdiction on a disputed question of fact and not a decision announcing or applying a principle of law. *Glover v. Fong, supra,* 42 Haw. 560; 21 C.J.S., *Courts,* § 187; 21 C.J.S., *Courts,* § 186. Following "precedent" set by a court of coordinate jurisdiction is merely a matter of comity and is applicable only when a court entertains doubt as to its own views. 21 C.J.S., *Courts,* § 200. Here, apparently the evidence left the trial judge with no doubt concerning the ruling to be made.

There was no error in the refusal of the trial judge to consider the judgment in *Kapiolani Estate, Limited* v.

*Territory of Hawaii, supra,* Law No. 5123, First Circuit Court, a binding precedent concerning the scope of Land Commission Award 6450, Apana 1.

We come now to the remaining and principal question raised on this appeal: Did the evidence require a ruling (contrary to that made by the trial judge) that the property awarded by L.C.A. 6450, Apana 1, was that described at page 486 of Volume 6 of the Land Commission Awards?

Pursuant to the pre-trial order, this case went to trial on the issue whether Intervenors owned any land in the area under condemnation. The Intervenors' theory was that the Land Commission Award covering the Ili of Mokauea carried with it the title to certain of the land underlying the sea fishery of Mokauea and that the title to that land remained in the awardee's heirs until conveyed to or inherited by the Intervenors. It became incumbent upon them to establish that initial title, stemming from L.C.A. 6450, Apana 1, as described at page 486, Volume 6, Land Commission Awards. On the other hand, if the original title covered only the property described at page 769, Volume 6, Land Commission Awards, which omitted any land underlying the sea fishery, the Intervenors owned no land in the area under condemnation.

Intervenors contend that the lower court's judgment was based on erroneous findings of fact and conclusions of law. Their specifications of error[18] cover all of the

---

[18] "The Judgment entered in the Circuit Court is erroneous in that said Judgment is based on findings of fact and conclusions of law which were in error and not supported by testimony, evidence or any matter of record adduced at the trial, to-wit:

"(a) The Circuit Court committed error in concluding that the Land Commission was not required to evidence decisions concerning corrections of erroneous entries in Award Books by signing the corrections.

"(b) The Circuit Court committed error in concluding that the Land Commission did their duty and that the signatures to LCA 6450, at Page 491, covered the corrected description of Apana 1 at Page 769.

"(c) The Circuit Court committed error in concluding that the amended description of Apana 1 of LCA 6450, copied on Page 769 of volume 6 of the awards, was incorporated by reference in LCA 6450

conclusions of law except those directing entry of the appropriate judgment and preserving jurisdiction to adjudicate other claims. They attack only the weight and sufficiency of the evidence. Their argument is that there was no evidence to support those conclusions of law and many of the findings of fact on which they were based.

In reviewing the evidence presented to the trial judge on the question of the scope of the award made by L.C.A. 6450, Apana 1, the admonition is ever present that findings of fact of the trial court will not be set aside unless the appellate court is left with a definite and firm conviction that a mistake has been committed. H.R.C.P., Rule 52(a); *Filipino Fed. of America, Inc.* v. *Cubico,* 46 Haw. 353, 380 P.2d 488; *Peine* v. *Murphy,* 46 Haw. 233, 377 P.2d 708; *Mitchell* v. *Branch,* 45 Haw. 128, 363 P.2d 969; *Miller* v. *Loo,* 43 Haw. 76; *Lum* v. *Stevens,* 42 Haw. 286; *Hawaii Builders Supply Co.* v. *Kaneta,* 42 Haw. 111.

Examination of Volume 6 of the Land Commission Awards discloses the following:

The ten apanas of L.C.A. 6450 described by metes and bounds at pages 486 and 487 are followed by the diagrams of those apanas at pages 488 to 490. At the top of page 491 appears the statement of costs ($30), the recital that the claim is awarded as a freehold less than allodial which may be converted to an allodium upon payment of the government's one-third, the signatures of the Land Com-

---

appearing at pages 486 to 491 inclusive of volume 6, and superseded the description of Apana 1 copied at page 486 and crossed out.

"(d) The Circuit Court committed error in concluding that the correction of the entries concerning Apana 1 was made by the Land Commission with authority of the Land Commissioners.

"(e) The Circuit Court committed error in concluding that land awarded by LCA 6450, Apana 1, was the land described on page 769 of volume 6 and that said award did not cover any land within the sea fishery of Mokauea.

"(f) The Circuit Court committed error in concluding that the intervenors have no right or interest in and to the fee simple title to any land within the sea fishery of Mokauea as described in the Amended Complaint in this cause."

missioners and the date, September 17, 1851. The metes and bounds description of Apana 1, however, is crossed out with a large "X", and above it is written "See Page 769, Apana 1. (It is the correct one)." Within the diagram of Apana 1 at page 488 there is a note signed by J. L. Nailiili, a clerk of the Land Commission, which states: "Explanation: Apana 1 copied on this page; the sea has been changed and set aside, and recopied on page 769. It is the correct one." In the lower part of the diagram, within the area labeled "Sea of Mokauea," there is a further notation reading "sea set aside."

At page 769, under the same award heading, there is another metes and bounds description, and diagram, of Apana 1, L.C.A. 6450. In this description and diagram the sea area of Mokauea is omitted. Above the award heading is the notation "Signatures to this as amended on P. 491." Above the description is the note "(From Page 486)," and below the diagram is the reference "See Page 486." There were no signatures or date on page 769.

In their attempt to counter the plainly indicated omission of the sea area of Mokauea by the correction of the description of Apana 1 in the Award, Intervenors adduced the following evidence: there were numerous cases of corrections in all the volumes of Land Commission Awards; the corrections were the basis for the award; in many instances corrections were signed by one or more of the commissioners, in others they were signed by the secretary of the commission and by both the secretary and the commissioners; nine examples of corrected awards signed by one or more of the commissioners (certified photostatic copies) were introduced in evidence as exhibits; the judgment in Law No. 5123 (referred to at length above) was offered to show that the description at page 486 of Volume 6 properly described the property awarded under Apana 1; Government Survey Registered

Map No. 1471, dated 1883, describing the Mokauea Fishery area as "No Fishery Awarded. Simply held under Statute," was received as an exhibit.

It can be readily seen that some of this evidence militates against Intervenors' claim that the corrected description of Apana 1 should be ignored. In the face of documented correction, with unequivocal memoranda concerning it, in the official volume of the Land Commission, the remainder of the evidence is hardly adequate to establish that the sea area was awarded.

There is no dispute as to Intervenors' contention that Land Commission Awards conferred title and were final. *Kekiekie* v. *Dennis,* 1 Haw. 42; and see *Kenoa* v. *Meek,* 6 Haw. 63; *Rose* v. *Yoshimura,* 11 Haw. 30. But Intervenors further argue that the award in this case was complete on September 17, 1851, when it was signed by the commissioners and that the clerk of the Land Commission had no authority to alter the award. This argument assumes that the corrected description and diagram of Apana 1 (both undated) were prepared subsequent to September 17, 1851. It must be said that there is support for that assumption in that the corrected description appears at a later page in Volume 6 and that one of Nailiili's references to it bears the date of March 25, 1853.

However, this court quite early took notice of the fact that portions of awards were often prepared well in advance of being finally settled and signed. *Boundaries of the Ili of Kewalo,* 3 Haw. 9, 15. It is much more reasonable to assume that the original description here was prepared in advance, and that when errors in it were discovered they were crossed out and the corrected description entered and cross-referenced in the Award Book before the commissioners affixed their signatures to the award. This assumption is substantiated by the facts in evidence that both descriptions were prepared by the same surveyor and

that he billed the Land Commission and was paid before the award was signed. It is further bolstered by the fact that the Certificate of Award (received as an exhibit) ultimately issued to the awardee bore the same date as the award and had attached to it a certified copy of the corrected description of Apana 1. Both the Certificate of Award and the certified copy of the corrected description were signed by one of the Land Commissioners. Finally, it was demonstrated at the trial, through examination of Volume 6, that the page 769 description could well have been made almost contemporaneously with the page 486 description.

It can hardly be said that Intervenors' evidence was sufficient to justify a finding that the original description of Apana 1, as it stood before correction, should prevail, much less to require a finding or to produce a definite and firm conviction that the trial judge made a mistake in determining that the corrected description of Apana 1 at page 769 properly delineated the land covered by the award.

On the other hand the State introduced a substantial amount of evidence to demonstrate that the correction of the original description of Apana 1 and the refusal of the Land Commission to award any land underlying the sea fishery were consistent with established practice and policies of the Land Commission. The State also introduced evidence to show that the correction was made before the Certificate of Award was delivered to the awardee and before the award became final.

Corrections in the Award Books were routinely made.[19]

---

[19] This was understandable in view of the monumental task that confronted the commission during its nine years of existence. During that period (1846 - 1855), it processed nearly 12,000 claims, compiled more than fifty volumes of testimony, and made awards filling ten huge volumes. *Indices of Land Commission Awards* (1929 ed.), Foreward, p. viii. It must be remembered also that in those days all legal documentation was painstakingly and laboriously handwritten so the apparent sloppiness in this practice becomes reconcilable.

Witnesses for both the State and Intervenors testified to their knowledge of the existence of scores of errors and corrections. Examination of Volume 6 in court showed that corrections could be found in that volume merely by opening the book at random. There was testimony that in Volume 6 alone there were at least one hundred pages bearing corrections.

There appears to have been no consistent practice concerning the explanation of corrections, referencing the authority for corrections, or the signing of corrections. The evidence showed that some of the corrections were accompanied by explanatory notes and others without; in cases where there were explanatory notes, some of them referred to the correction as having been made with the authority or at the direction of the commission, while others contained no mention of the authority for the change. Sometimes the corrections were signed by all or some number less than all of the commissioners. In many instances the corrections were not signed by any of the commissioners.[20]

However, the evidence showed that in every instance where the award had been compared with the Royal Patent later issued on the award, it had been found that the patent followed the corrected description, not the initial description, in the award. This would confirm the validity and efficacy of the correction, irrespective of the particular manner in which the corrections were made.[21]

---

[20] In L.C.A. 420, for example, covering the area in which the town of Wailuku is now located on Maui, no signatures of commissioners appeared at any place in the award, either as originally written or as corrected.

[21] Upon payment of commutation fees, Royal Patents were to be issued "to the claimants of lands *pursuant to the terms* in which the said board shall have confirmed their respective claims" and *"in accordance with the award* of said commissioners." Part I, Ch. VII, Art. IV, §§ 9 and 11 of the Act of April 27, 1846, Laws of 1846, page 107 (emphasis added). (Reprinted, II R.L.H. 1925 at page 2123.)

The evidence further showed that the Land Commission generally declined to award sea fisheries as land; and in the one or two cases which slipped through because of oversight, the government, in disputing the claims, satisfactorily compromised them. While the Land Commission did have incidental jurisdiction with respect to sea fisheries (*Bishop* v. *Mahiko, supra,* 35 Haw. 608, 655-656) the commission regularly declined to exercise even that jurisdiction. See, *Carter* v. *Hawaii,* 200 U.S. 255.

The evidence conclusively demonstrated that awards were not delivered, and clear title was not conveyed, until the costs had been paid by the applicant. See also, *Principles Adopted by the Board of Commissioners to Quiet Land Titles,* August 20, 1846, ratified by Resolution of October 26, 1846, Laws of 1847, page 94 (reprinted II R.L.H. 1925 at pp. 2124-2137), and *Kalama* v. *Kekuanaoa & Ii,* 2 Haw. 202. The Certificate of Award given the applicant clearly made the payment of costs a condition precedent to the award taking effect. This was true in this case as the Certificate of Award issued to Moehonua (photostatic copy in evidence as an exhibit) states in part (emphasis added):

"Certificate of Award

"The board of commissioners to quiet land titles this day confirms * * *.

"This certificate *recognizes* as his freehold less than allodial, the land for which he is submitting claim, at * * * on the Island of * * *, *upon payment of expenses* in connection with the service to the sum of * * *.

"*If this afore-mentioned sum is not paid, this certificate does not award him a clear title * * *.*"

The correction of the initial description of L.C.A. 6450, Apana 1, and the award of that Apana made by the commission using the corrected description, were wholly consistent with the policies and practice above discussed.

There appear to have been two principal reasons necessitating a revision of the Volume 6, page 486, initial description. The first was that the original survey included the sea fishery of Mokauea, which the commission treated as being not within its jurisdiction and which it would not award as it did land. In this instance, the sea fishery was not separately described, but was lumped together with the kula land and fishponds in a single all-encompassing description. The award could not be corrected, as in the case of a separately described fishery, by merely striking out the Apana which covered the fishery. An entirely new description was required.

The second reason was that the initial survey was defective. Notwithstanding the diagram of that survey appearing at page 488 of Volume 6, the survey would not close. The evidence demonstrated that when the metes and bounds description originally prepared by the surveyor was plotted it failed to close, missing closure by more than one thousand feet. Among other things, in the page 486 description, the surveyor had completely left out one course and had erred in both azimuths and distances on other courses.

The corrected metes and bounds description of Apana 1, set forth at page 769 of Volume 6, conformed to the jurisdiction of the commission, eliminated the errors, fit the conditions on the ground and did close.

In making the correction, the commission followed its consistent practice of crossing out that which was in error and inserting a reference to the volume and page at which the corrected version appeared. This cross-referencing effected an incorporation of the corrected description and diagram at page 769 into the body of the award at pages 486 to 491 of Volume 6. Incorporation by reference makes the subject matter referred to as much a part of that which incorporates it as though set forth therein at full length.

*Cf., Davis* v. *Governor Quinn,* 43 Haw. 261.

The records of the Land Commission (photostatic copies in evidence as exhibits) clearly indicate, also, that the award of Apana 1 was not delivered until the awardee had paid the costs, and that the correction was made before those costs were paid. The costs of adjudication of Apanas 1 through 10 were $30 and the costs of survey were $50 for a total of $80. On March 4, 1853, Moehonua paid $74 to the commission for the costs of adjudication of Apanas 2 through 10. That payment did not include payment of the costs of adjudication of Apana 1. The payment of $6 for the latter was not made until March 26, 1853. This payment for Apana 1 was made the day after the clerk of the Land Commission had made the notation, dated March 25, 1853, in the diagram of Apana 1 at page 488, to the effect that the sea had been set aside and that the correct description of the apana was set forth at page 769. It is obvious that the entry at page 769 must have been made prior to March 25, 1853, otherwise the clerk would not have known to what page to refer for the corrected description. It is also clear that the Certificate of Award, although dated on the same date as the award, could not have been given to Moehonua on that date (September 17, 1851) because it was a printed form containing an internal reference (which had been crossed out) to the Act of June 19, 1852. In any event, as previously mentioned, the award did not become effective until the costs were paid. They were not paid until after the correction had been made, entered in the Award Book and cross-referenced therein.

That the Land Commission construed its award of Apana 1 as covering only the land described at page 769 of Volume 6 is evidenced in both the official index of awards prepared by the Land Commission and in the certified copy of the descriptions of the apanas which the

commission furnished to Moehonua. This copy was certi-
fied to be a true copy by J. Kekaulahao, one of the Land
Commissioners, who had also signed the original award
and embodied therein the description of Apana 1 as set
forth at page 769 of Volume 6.

There is no record that Moehonua ever appealed the
decision of the Land Commissioners to exclude the Mo-
kauea sea fishery from his award, or that he was dissatis-
fied with the corrected award. All the evidence is to the
contrary. His complete acceptance of the fact that the
description of the land as corrected at page 769 covered
everything to which he was entitled to be awarded in
Mokauea is evidenced by his dealings with the land. In
1857 he mortgaged Mokauea to J. E. Barnard utilizing the
corrected description. In 1865 he leased the konohiki
fishing rights to Moolaka and Pehunui, acknowledging
that he owned only fishing rights in the sea of Mokauea.
In 1871, he introduced into evidence the corrected descrip-
tion in a suit involving a fishpond and some of the land
covered by L.C.A. 6450. *Kapea* v. *Moehonua,* 6 Haw. 49.
In 1873, as an adjoining owner, he relied on the corrected
description in proceedings for the settlement of the
boundaries of Kaluapulu.

In confirming the applicant's title, a Land Commis-
sion Award is similar to a deed by which title is granted.
That Moehonua, as grantee, and the Land Commission,
as grantor, construed the award of Apana 1 as covering
only the land described at page 769 of Volume 6 cannot
be doubted in view of the foregoing. If considered ambig-
uous, the construction given a deed by the parties to it
will be given effect unless it contravenes some rule of law.
*Nahaolelua* v. *Heen,* 20 Haw. 372; *Levy* v. *Lovell,* 24 Haw.
716; see, *Bishop Estate* v. *Castle & Cooke,* 45 Haw. 409,
368 P.2d 887.

Moehonua died intestate in 1878. Following his death

there was extensive judicial proceedings in connection with his property, both in the administration of his estate and in collateral cases in which claims to his property were made. If there had been any mistake or invalidity in the correction of the description and award of Apana 1, it would certainly have been brought to light in such proceedings. Such evidence as can be obtained from those cases confirms that none of the parties concerned held any belief that Apana 1 carried with it the title to any submerged land in the sea fishery of Mokauea.

The scramble for the land covered by L.C.A. 6450 began in 1882 in proceedings to determine Moehonua's heirs. King Kalakaua unsuccessfully claimed one-quarter of the estate as a nephew of Moehonua. *Estate of Moehonua,* 6 Haw. 338. In 1883 Queen Kapiolani joined with Kalakaua in asserting an additional claim as grantee. They were thwarted in *Kalakaua* v. *Keaweamahi,* 4 Haw. 571, and in *Kalakaua* v. *Keaweamahi,* 4 Haw. 577. In the latter suit reliance was placed on the corrected description of Apana 1 and the record discloses no objection by any of the parties, which included all of Moehonua's heirs, that Apana 1 was not correctly described at page 769 of Volume 6.

Kalakaua, having failed to establish any of his claims, eventually acquired the Ili of Mokauea by purchase from Moehonua's estate. At the completion of administration, Moehonua's heirs petitioned the probate court to appoint a commissioner to survey, plot and sell all of Moehonua's remaining property at public auction. For this purpose the commissioner utilized the corrected description of Apana 1 appearing at page 769 of Volume 6. After the public sale the proceeds were divided among Moehonua's heirs.

Examination of the proceedings in Moehonua's estate confirms that Moehonua's administrator and Moehonua's

heirs did not conceive that the estate owned any land in the sea fishery of Mokauea, and that in any event it was their intention to sell whatever was owned by the estate to Kalakaua. If, as Intervenors contend, any submerged land was owned by the estate, it passed to Kalakaua, the State's predecessor in title, who purchased, under the deed in evidence, all of the parcels constituting the Ili of Mokauea as well as the appurtenant fishing rights. A deed should be construed most favorably to the grantee. *Ahmi* v. *Waller*, 15 Haw. 497, 499. Further, if an ambiguity exists, the situation of the parties to the deed should be considered in determining their intention, and the intent so determined should be given effect if practicable. *Nahaolelua* v. *Heen, supra*, 20 Haw. 372; *Levy* v. *Lovell, supra*, 24 Haw. 716; see, *Bishop Estate* v. *Castle & Cooke, supra*, 45 Haw. 609, 368 P.2d 887.

The fact that Moehonua's administrator and his heirs recognized that Apana 1 did not extend into the fishery, and that the estate owned only fishing rights therein, is further evidenced by the inventory filed in the estate and by a lease made to Moehonua's principal heir. In both instances, Apana 1 was described in accordance with the corrected description at page 769 of Volume 6.

The Land Commission had the powers of a court of record and its awards were equivalent to final judgments unless reversed or modified by the Supreme Court on appeal. *Keelikolani* v. *Robinson*, 2 Haw. 522. The evidence hereinabove discussed establishes conclusively that the awardee, his administrator and his heirs acquiesced in the construction of the award urged by the State in these proceedings. Construction of a judgment acquiesced in by the parties will not be changed without strong reason. 49 C.J.S., *Judgments*, § 436.

It was further established at the trial of this cause that Moehonua's successors in title also acquiesced in the

construction intended by the Land Commission and urged by the State. In the deed by which Kalakaua divested himself of title to the property in 1887, the acreages used were the same as those stated in the commissioner's deed to Kalakaua. The same was true of the later conveyance of that land to Kapiolani Estate, Limited in 1899. In the interim Queen Kapiolani had mortgaged the land, using the same method of description. She had also leased the Mokauea fishponds together with right to "net mullets from the sea rights," thus recognizing the fact that she had only konohiki fishing rights in the sea of Mokauea.

It was not until after the turn of the century, in 1902, that any claim to ownership of fee title to the submerged land area was made by any of Moehonua's successors in interest. Kapiolani Estate, Limited, the then owner of the Ili of Mokauea, applied for a land patent upon a portion of Apana 1, including the sea fishery. Upon refusal of the board of appraisers to appraise the sea fishery for commutation purposes, Land Patent 8147 was issued on this application covering only the fishpond and kula lands applied for and excluding the sea fishery of Mokauea. The diagram contained in the Land Patent expressly labeled the area makai (seaward) of the fishpond wall as a fishery.[22]

The claim of title to the submerged land was, however, subsequently abandoned. In 1908 application was made for a Land Patent upon the other fishponds and remaining kula land awarded by L.C.A. 6450, Apana 1. This application did not include the sea fishery area. Land Patent 8194 thereupon was issued, and like the earlier

[22] The dissatisfaction of Kapiolani Estate, Limited, with the refusal of the government to patent the fishery, was shown by subsequent correspondence on the matter, and by its claim of title to the sea bottom asserted when it registered its fishing rights in Law No. 5123, First Circuit Court, entitled *Kapiolani Estate, Limited* v. *Territory of Hawaii,* *supra,* discussed at length above.

Land Patent 8147 it covered only the land and ponds mauka of the fishpond walls and did not extend into the Mokauea fishery.[23] No Royal Patent or Land Patent for the fishery area, omitted from the amended description of Apana 1, set forth at page 769 of Volume 6, has ever been issued.

After abandonment of the attempts to obtain a land patent on the sea fishery, the claim to ownership of title to the underlying land of the fishery lay dormant for more than thirty years, only to be raised again in connection with these condemnation proceedings.

As seen above, the Land Commission considered only the land described at page 769 of Volume 6 as having been awarded as Apana 1. At all times since the dissolution of that body, the government has consistently followed the same construction of the award: in the publication, in 1881, of an Index of All Claims Awarded by the Land Commission, in which page 486 of Volume 6 is referenced for 9 apanas (containing the aggregate acreage of Apanas 2 through 10), and page 769 of Volume 6 is referenced for the acreage contained in Apana 1 of L.C.A. 6450; in the certification as a true copy by the Minister of Interior, in 1882, of a copy of L.C.A. 6450, in which Apana 1 was described by the metes and bounds set forth at page 769; in the limitation of the makai boundaries of Apana 1 to the fishpond walls in the survey done by C. J. Lyons and J. F. Brown, who were also government surveyors, in connection with the sale of the land by Moehonua's estate; in the use of the J. F. Brown survey in the preparation of Government Survey Registered Map No. 1255; in labeling the Mokauea sea fishery on Government Survey Map No. 1471 (compiled under the direction

---

[23] With the exception of patents covering a few small parcels near King Street in the mauka portion of Apana 1, Land Patents 8147 and 8194 covered all of the land awarded by L.C.A. 6450, Apana 1.

of C. J. Lyons and dated 1885) as not awarded and as being simply held by statute; in the refusal of the board of appraisers, in connection with the application for Land Patent 8147, to determine the commutation due for the fishery, on the basis that it had not been awarded, and the issuance of Land Patent 8147, excluding the sea fishery; in the non-issuance of any Royal Patent or Land Patent for the area covered by the sea fishery; and finally, in its resistance in this case to the claim of private title to those submerged lands.

Coupled with the other evidence in the case the foregoing shows that all private individuals and government officials concerned have consistently construed L.C.A. 6450 to mean exactly what it states on its face, namely, that the description of Apana 1 at page 769 is the correct one, the only exceptions being the claims made early in this century by Kapiolani Estate, Limited (in connection with its application for Land Patent 8147 and in connection with its application for registration of fishing rights under the Organic Act) and the claims made by Hawaiian Dredging Company, Limited and the Intervenors in this case.

Intervenors' entire case is built upon the theory that the correction of the description of Apana 1 was invalid because the Land Commissioners did not sign the page on which the corrected description is set forth. The statute dissolving the Land Commission directed the commissioners to sign all their awards and deliver their books and papers into the hands of the Minister of Interior. Act of July 20, 1854, Laws of 1854, page 21 (reprinted, II R.L.H. 1925, page 2146). In the face of the evidence in the record it can safely be presumed that they did their duty when they signed the award at page 491 of Volume 6.

Land Commission Award 6450 was made one hundred and thirteen years ago. A mere thirty-two years after it

was entered this court said when the award was attacked in *Kalakaua* v. *Keaweamahi, supra,* 4 Haw. 577, 580:

"* * * We are not to assume after this lapse of time that the Land Commission had no authority for issuing the award they actually did issue."

In the same case the court quoted with approval from Story's Equity Pleadings as follows:

" '* * * The policy of the law is to give quiet and repose to titles. After great lapse of time and long peaceable possession Equity Courts ought not to interfere.' " 4 Haw. 577, 582.

In the light of the foregoing convincing demonstration of the soundness of the trial court's findings of fact and conclusions of law, as reflected by the evidence in the record, the judgment in No. 4277 is affirmed.

Having confirmed the judgment appealed from in No. 4277 denying Intervenors' claims to the underlying land of the sea fishery of Mokauea, we turn now to consider the judgment appealed from in No. 4347 denying Intervenors' claims to konohiki fishing rights.

As we have seen, Mokauea fishery is appurtenant to the Ili of Mokauea, of which Moehonua was the konohiki (chief or landlord). Moehonua died intestate, his heirs were judicially determined and pursuant to the request of the heirs the Ili of Mokauea and appurtenant fishing rights, together with other property, were sold by a court-appointed commissioner. King Kalakaua purchased the Ili and appurtenant fishing rights, and from him, title passed by mesne conveyances to Kapiolani Estate, Limited.

Following passage of the Organic Act upon annexation, Kapiolani Estate, Limited took steps to prevent loss of the fishing rights to the general public, under the provisions of Section 95 (set out in footnote 17, *ante*), by initiating and carrying to judgment the proceedings (Law No. 5123 discussed at length above) required by Section

96 (set out in footnote 16, *ante*) of the Organic Act. Thereafter, title to the registered rights passed to Hawaiian Dredging Company, Limited, one of the defendants in this condemnation case. Hawaiian Dredging Company, Limited, in a compromise settlement of its claims in this action, conveyed the fishing rights to the Territory of Hawaii.

At the time of the trial of Intervenors' claims to ownership of an interest in the fishing rights[24] the State set up the following three roadblocks, any one of which if effective could bar Intervenors from asserting their claims: (1) that the State was already the owner of all private fishing rights preserved in the manner required by the Organic Act, as successor in title to Kalakaua; (2) that if Intervenors' predecessors in title had retained any private rights in the Mokauea fishery, those rights had been surrendered to the public through failure of the Intervenors' predecessors to preserve them as required by the Organic Act; and (3) that any rights of Intervenors' predecessors which survived the destructive effect of the Organic Act were lost by adverse possession of the State's predecessors in title.[25]

The Intervenors claim an interest in the konohiki fishing rights through descent from Koma, who was one of the heirs of Moehonua, and through conveyances from the heirs of G. W. Keaweamahi, another of Moehonua's heirs.[26] In the proceedings in which Moehonua's heirs

[24] Hoaaina fishing rights, that is rights of the tenants of the ili, are not involved in this appeal as Intervenors have claimed only an interest in konohiki rights.

[25] The trial judge, in denying Intervenors' claims, found all three roadblocks to be effective to bar Intervenors' claims and based his judgment on all three theories advanced by the State in opposition to Intervenors' claims.

[26] Their interests were all acquired subsequent to April 30, 1903, the deadline fixed by Section 95 of the Organic Act for the registration of vested interests in fishing rights.

were determined, the court ruled that Koma was entitled to 1/28th and that G. W. Keaweamahi was entitled to 1/12th plus ¼th of Moehonua's estate. *Estate of Moehonua,* 6 Haw. 338, 342. Intervenors therefore claim, in the aggregate, an undivided 31/84ths or approximately 37% undivided interest.

The theory of their claim is as follows: when the Ili of Mokauea was sold in the court administered proceedings for liquidation of Moehonua's remaining real estate, Kalakaua received a deed in which the land was described as four separate parcels, with one of which the fishing rights were sold. In the deed the metes and bounds description of that parcel was followed by the words "and also 266 acres of fishing right belonging to the same." Some 24 years later Kalakaua's successors in title, Kapiolani Estate, Limited, obtained a judgment,[27] registering the konohiki fishing rights, in which the fishery was described as covering an area of 480 acres. Looking back from that judgment Intervenors reason that Moehonua's estate must have originally owned 480 acres of fishery, and, since only 266 acres of it had been conveyed to Kalakaua, the residue remained in Moehonua's heirs.

Neither Moehonua's heirs nor any of Intervenors' predecessors in title filed any proceedings pursuant to Section 96 of the Organic Act (set out in footnote 16, *ante*) to preserve the private fishing rights which Intervenors now claim to own. Intervenors assert, however, that registration of the fishing rights by Kapiolani Estate, Limited (the State's predecessor in title) inured to their benefit and preserved their rights from being forfeited to the public pursuant to the provisions of Section 95 of the Organic Act (set out in footnote 17, *ante*).

---

[27] This judgment in Law No. 5123, discussed above, is apparently valid as to the registration of the konohiki fishing rights which was within the limited jurisdiction conferred by Sections 95 and 96 of the Organic Act.

Intervenors' statement of the questions involved and Intervenors' specifications of error present for review the entire case, tried in the court below, on the matter of ownership of konohiki fishing rights.[28]

Since we feel that the second roadblock set up by the State, covered by Intervenors' second specification of error designated (b) and set out in footnote 28, *ante,* is decisive and dispositive of this appeal, we will assume, without deciding, that there remained in Moehonua's heirs a "residue". interest in the konohiki fishing rights after the conveyance to Kalakaua. This obviates the necessity of construing the deed from the estate of Moehonua to Kalakaua, or of struggling with the unique question as to the applicability of the doctrine of adverse possession to konohiki fishing rights.

---

[28] "STATEMENT OF THE QUESTIONS INVOLVED

"Appellants submit that the judgment of the Circuit Court in this cause was in error and was based upon erroneous findings of fact and conclusions of law.

"Appellants contend that the registration of the sea fishery of Mokauea by Kapiolani Estate, Limited, enured to the benefit of appellants and that appellants are vested with a right in and to said sea fishery."

"SPECIFICATIONS OF ERRORS RELIED UPON

"The Judgment entered in the Circuit Court is erroneous in that said Judgment is based on findings of fact and conclusions of law which were in error and not supported by testimony, evidence or any matter of record adduced at the trial, to-wit:

"(a) The Circuit Court committed error in concluding that the deed by which Kalakaua obtained title to the konohiki fishing rights in the sea fishery of Mokauea was intended to and did convey the entire interest in the konohiki fishing rights in the whole of the fishery and that the statement of acreage was mere surplusage and is not controlling.

"(b) The Circuit Court committed error in concluding that the failure of Appellants' predecessors in interest to establish their fishing rights, if any they had, as required by the Organic Act if those rights were to survive, and the establishment by the State's predecessor in interest of sole and exclusive ownership of the konohiki fishing rights, preclude the Appellants from now claiming ownership of fishing rights against the State.

"(c) The Circuit Court committed error in concluding that none of the Appellants has any right, title or interest in and to the konohiki fishing rights in the sea fishery of Mokauea and that ownership of all private fishing rights in the sea fishery of Mokauea is now vested in the State."

Intervenors have admitted in their briefs that their predecessors in title took no action to protect their claimed private fishing rights from being terminated under the provisions of Section 95 of the Organic Act. They seek to avoid the effect of this neglect by asserting that the action taken by Kapiolani Estate, Limited, successor in title to Kalakaua, inured to their benefit.

Konohiki fishing rights were granted by statute, commencing with the Act of Kamehameha III, June 7, 1839 (reprinted, as amended, November 9, 1840, in Fundamental Law of Hawaii, pp. 21-23), and ever since have been the subject of statutory regulation. R.L.H. 1955, §§ 21-20 through 21-33. Under these statutes the konohiki is entitled to either taboo (tabu) one species of fish for himself, or to declare open and closed seasons and to take one-third of the tenants' catch during the open season for himself. The tenants are entitled to all other fish and no one other than the konohiki and his tenants are permitted to fish in the private fishing ground. See, *Haalelea* v. *Montgomery,* 2 Haw. 62, 66; *Damon* v. *Hawaii,* 194 U.S. 154; *Bishop* v. *Mahiko, supra,* 35 Haw. 608, 629, and *Territory* v. *Bishop Trust Co.,* 41 Haw. 358, 369, *rehearing denied,* 41 Haw. 597. While the tenants' fishing rights have been assumed to be vested rights within the meaning of Section 95 of the Organic Act, it has been clearly established that the konohiki's rights were vested within the meaning of that section. *Damon* v. *Tsutsui,* 31 Haw. 678, 692-693; *Bishop* v. *Mahiko, supra,* pp. 678-679; *Carter* v. *Hawaii, supra,* 200 U.S. 255; *Damon* v. *Hawaii, supra.*

By Section 95 of the Organic Act (set out in footnote 17, *ante*) the statutes granting the private fishing rights were repealed, thus opening all sea fisheries to the public, subject to vested rights, and vested rights had to be judicially established to survive. Section 96 of the Organic Act (set out in footnote 16, *ante*) prescribed the procedure

for establishing vested fishing rights through judicial action.

This court has declared that the intent of the Congress in enacting these sections was to destroy, so far as it was in its power to do so, all private rights of fishery and to throw open the fisheries to the people. *In re Fukunaga,* 16 Haw. 306, 308; *Territory* v. *Matsubara,* 19 Haw. 641, 643-644. It would be contrary to that intent to hold that an owner of vested fishing rights was not required to register his own rights but could rely upon and be protected by the registration effected by another person claiming adversely to him. Statutes should be so construed as to carry out the intent of the legislative body enacting them. *In re Chung's Appeal,* 44 Haw. 220, 352 P.2d 846; *Territory* v. *Morita,* 41 Haw. 1.

The plain language of Sections 95 and 96 of the Organic Act demonstrates that a person claiming a vested right was required to register that right in order to preserve it and that he was not entitled to rely on action taken by someone else. Section 95 repealed all laws which conferred exclusive fishing rights upon "any person or persons" and threw open the fisheries to the public "subject, however, to vested rights." It also declared that "no such vested right" should be valid after the expiration of three years "unless established as hereinafter provided." Section 96, detailing the procedure for establishing vested rights, required that "any person who claims a private right to any such fishery shall * * * file his petition * * * setting forth his claim to such fishing right." Language more clearly requiring a claimant to establish *his* right, and precluding *any person* from continuing to enjoy *his* right if *he* took no action, could hardly have been formulated. To construe these words as permitting a claimant to retain his right, as against the public, by riding the coattails of another claimant would be doing violence to

both the express language and clear purpose of those sections.

As stated in *Damon* v. *Tsutsui, supra,* 31 Haw. 678, 692:

> "The language of Section 95 is entirely unambiguous. There can be no doubt that its intent was to repeal all laws of Hawaii which conferred exclusive fishing rights, * * * and that vested rights were not to be excepted or protected unless established judicially by proceedings instituted within two years from the date of the Organic Act."

Turning to the registration of konohiki fishing rights in the sea fishery of Mokauea, effected by Kapiolani Estate, Limited, it is apparent that no rights of persons other than Kapiolani Estate were intended to be, or were, established in those proceedings. Both the petition and the amended petition filed in *Kapiolani Estate, Limited,* plaintiff v. *Territory of Hawaii,* defendant, Law. No. 5123, First Circuit Court, alleged that plaintiff "is the *sole* owner * * * and has an *exclusive right* to the use and enjoyment of * * * the sea fishery of Mokauea * * *; that said fishing ground and fishery is the *private* property of the plaintiff, and that *no other person* or persons, corporation or corporations, have any right, title or interest in and to the said fishing ground and fishery * * *" and concluded with the prayer "* * * that plaintiff may be adjudged to be the *sole* owner of said fishery and fishing ground * * *" (emphasis added). Responsive to the petition and amended petition and the evidence, the judgment entered in those fishery registration proceedings decreed: "That the said plaintiff has a vested *private right* in and to that certain Fishery known as the Sea Fishery of Mokauea * * * and is the private property of the plaintiff, and that *no other person* or persons, corporation or corporations have any right, title or interest in and to the said

fishing grounds and fishery; * * *" (emphasis added).

Neither the language of the petition and amended petition, nor that of the judgment admits of the interpretation that any right other than that claimed by Kapiolani Estate, Limited was sought to be, or was, established in those proceedings.

In view of the explicit requirements of Sections 95 and 96, there can be no doubt that Intervenors' predecessors in title abandoned their konohiki rights in Mokauea, if in fact they retained any following the conveyance to Kalakaua. They had ample opportunity to preserve those rights but, in the face of the mandate of the Organic Act that they take action to preserve them, they did nothing. Persons entitled to establish their ownership of land before the Land Commission, but who failed to do so within the time required, abandoned their titles to the government. *Kenoa* v. *Meek, supra,* 6 Haw. 63; *Thurston* v. *Bishop,* 7 Haw. 421. The same ruling is applicable to the similar situation, involving the establishment of fishing rights, now before us.

Intervenors' theory of this feature of the case, apparently, is that they are entitled to the benefits of that judgment (preservation of the konohiki fishing rights), while not subject to its burdens (adjudication of Kapiolani Estate as sole owner). Thus, Intervenors are forced to admit that the judgment obtained by Kapiolani Estate, Limited was valid for the purpose of preserving the konohiki fishing rights, otherwise those rights would have passed to the public and no claim of compensation for the taking of them could now be made. At the same time Intervenors claim either that the circuit court had no jurisdiction to adjudicate that Kapiolani Estate, Limited was the exclusive owner of those rights, or, if the court had jurisdiction, that the judgment is not binding upon them.

By way of explanation Intervenors offer, in justifica-

tion of their theory of the double-barreled effect of the judgment, that the judgment is susceptible of the construction that Kapiolani Estate, Limited, in establishing these konohiki fishing rights, did so as a cotenant of the ili, or as a cotenant of the fishery, for the benefit of itself and its cotenants. Presumably, "cotenants" as used by Intervenors means co-owners of the konohiki fishing rights[29] rather than tenants of the konohiki, as tenants' fishing rights have not been claimed by the Intervenors.

This explanation, however, ignores the express language of the petition and amended petition, above quoted, demonstrating that Kapiolani Estate did not institute the fishery registration action with the benevolent motives which Intervenors now seek to attribute to that corporation. It also blithely ignores the express language of the judgment, which decrees that "no other person or persons, corporation or corporations, have any right, title or interest in and to the said fishing grounds and fishery."

Having suffered the judgment to be entered, without themselves having established their rights, if any, the Intervenors' predecessors in title were in the same position as persons who did not assert their claims to land before the Land Commission. It has been consistently held that in title suits against persons claiming under awardees, the judgment of the Land Commission is final and the court will not go behind the award even though it appears that the adverse claimant might have made good his claim by timely presentation of the same to the Land Commission. *Kukiiahu* v. *Gill*, 1 Haw. 54; *Bishop* v. *Namakalaa and Kahinukawa*, 2 Haw. 238; *Kaai* v. *Mahuka*, 5 Haw. 354; *Atcherley* v. *Lewers & Cooke*, 18 Haw. 625, *rehearing denied*, 19 Haw. 47, *aff'd*, 222 U.S. 285. The situation here

---

29 It is doubtful whether there can be undivided interests in konohiki fishing rights in view of the taboo right and the near feudal relationship between the king and konohiki as well as that between the konohiki and his tenants.

is the same, in that opportunity to establish a claim binding the government was given, but having been ignored, the claim should not now be permitted to be asserted against one who pursued, rather than slept on, his rights.

It was seen above in No. 4277, that actions brought under the provisions of Section 96 of the Organic Act were not in the nature of actions to quiet title, *Kapiolani Estate* v. *Territory, supra,* 18 Haw. 460; that although the judgments obtained in those actions are not res judicata as to persons neither parties nor privy to parties to the actions, it does not follow that persons who neglected to establish their fishing rights by such actions are entitled to the benefit of the judgments obtained by other persons and that each action was a special statutory proceeding whose effect is determined by the right asserted. *Bishop* v. *Mahiko, supra,* 35 Haw. 608, 665. The only right asserted in the fishery registration case here involved (Law No. 5123) was that of Kapiolani Estate, Limited. Intervenors, who are not privy to Kapiolani Estate, cannot reap the benefits of the preservation of that right.

*Bishop* v. *Mahiko, supra,* held that Section 96 constituted an enabling act empowering the Territory to acquire all private fishing rights by condemnation, and that establishment of the private fishing rights was the first of two parts of the single statutory proceeding contemplated by those sections. Referring to the action which the claimant of a fishing right was required to file, the court said at page 665:

> "* * * It is designed to settle as between claimants and the United States [the then repositary of the residual public rights of the citizens of the state] the ownership and identity of private sea fisheries."

While the court emphasized the need for determining the boundaries of private sea fisheries through these proceedings, the opinion makes it clear that an equally important part of the registration actions was for claimants

to establish, as against the government, the ownership of the fishing rights. The court further determined that the requirement to take the initiative in establishing private vested fishing rights by the claimants was not violative of the fifth amendment to the Constitution of the United States.

The court also held in this case that since the claims of the konohiki and of the tenants had not been established as required by Section 96, the compensation to which they might have been entitled upon condemnation had been waived, and further, that the legal effect of failure to establish the fishing rights was, as mandated by Section 95, to convert the exclusive private fishing rights into a public fishing right free to the use of all and did not violate the fifth amendment prohibition against the taking of private property for public use without just compensation.

The clear language of Sections 95 and 96 of the Organic Act, whose clearly expressed purpose and effect have been consistently recognized by this court, is conclusive against the claims of Intervenors, whose predecessors in title failed to preserve their claims, if any, in the sea fishery of Mokauea. The vested rights which were surrendered to the public continue to be free to the public. *Hawaii Const.,* Art. X, § 3.

Accordingly, the judgment denying Intervenors' claims to konohiki fishing rights in the sea fishery of Mokauea, appealed from in No. 4347, is affirmed.

In summary, the Motion to Dismiss for Lack of Jurisdiction in Lower Court is denied, and the judgments appealed from in both Nos. 4277 and 4347 are affirmed.

*Arthur K. Trask* (*Kinji Kanazawa* and *John R. Desha II* on the briefs) for Intervenors-Appellants.

*Clinton R. Ashford,* Special Deputy Attorney General (*Shiro Kashiwa,* Attorney General, with him on the brief) for Petitioner-Appellee.