918 P.2d 1157

**SOUTHWEST SLOPES, INC., and Robert L. Rice, Plaintiffs–Appellees,**

v.

**Gene K.H. LUM, Defendant–Appellant.**

**No. 16916.**

Intermediate Court of Appeals of Hawai'i.

June 19, 1996.

Lloyd Y. Asato, on the brief, Honolulu, for defendant-appellant.

Joseph Fagundes III (Robert L. Smith, on the brief), Kailua–Kona, for plaintiffs-appellees.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

BURNS, Chief Judge.

Defendant Gene K.H. Lum (Lum) appeals from the circuit court's February 22, 1993 judgment against him and in favor of plaintiffs Southwest Slopes, Inc. (Southwest), a Kansas corporation, and Robert L. Rice (Rice) (collectively, Plaintiffs) for $598,000, plus $117 costs and $4,625.36 attorney fees. Rice is also Southwest's president, director, and principal stockholder. We vacate the February 22, 1993 judgment and remand for further proceedings in accordance with this opinion.

## FACTS

On May 1, 1991 on a standard Deposit, Receipt, Offer and Acceptance (DROA) form, Lum, as "agent[,]" submitted an offer to purchase from Plaintiffs approximately 265.84 acres of vacant land (the Land) located in 'Opihihale, South Kona, Tax Map Keys 3–8–7–14–6 and –23. Plaintiffs were represented by Century 21 Associated Realty, Inc. (Century 21). On May 2, 1991 Plaintiffs submitted a counteroffer which Lum accepted (the Contract). The purchase price was $2,650,000. The initial down payment was $20,000. An additional $80,000 was due five days after the acceptance. Closing was scheduled on or before December 1, 1991 at the Kona office of Long & Melone Escrow, Ltd. (Escrow). On May 7, 1991 Escrow received Sasaki Saison, Inc.'s [1] check in the amount of $100,000. Paragraph 2(d) of the Contract states as follows:

> **(d) Title:** Seller agrees to convey the property with warranties vesting marketable title in Buyer, free and clear of all liens and encumbrances except *as shown on the Preliminary Title Report issued by Title Guaranty 9/18/90* and any other covenants, easements, reservations or restrictions now of record which do not materially affect the value of the property.

The name of the buyer and the buyer's tenancy were both "to be determined[.]"

In an April 1, 1992 affidavit filed on April 9, 1992, Rice stated in relevant part as follows:

\* \* \* \* \* \*

2. On or about August 25, 1988, acting on behalf of Southwest Slopes, Inc., and acting through our attorney, Robert L. Smith, we purchased the subject property in a commissioner's sale. . . .

\* \* \* \* \* \*

6. On or about September 18, 1990 I obtained a preliminary title report listing all liens and encumbrances against the property.

7. On or about May 1, 1991 I entered into a contract on behalf of Southwest Slopes, Inc. to sell the subject property to [Lum]. . . . I attached a copy of the preliminary title report to the DROA contract specifically setting forth the status of title as I knew it to be.

\* \* \* \* \* \*

12. I am not an archaeologist, have never commissioned an archeological study of the property, am unaware of any prior archeological reports and am not trained in the recognition of archeological sites. At the time that I entered into the contract, (Exhibit "B"), I had no reason to believe that the subject property contained anything that would be considered archeologically significant.

The following paragraph was expressly deleted from the Contract:

> TIME IS OF THE ESSENCE:
>
> If either Buyer or Seller for reasons beyond his control cannot perform his obligation to purchase or sell the property by the closing date, then such party by giving escrow written notice prior to the closing date called for in this contract with copies to all parties to this contract, can extend closing for no longer than 30 calendar days to allow performance. Thereafter time is of the essence and the default provisions of [this contract] apply. Any further extension must then be agreed to in writing by both parties. . . . This provision relates only to the extension of the closing date.

Exhibit A to the Contract specified in relevant part as follows:

> 3. DUE DILIGENCE PERIOD. Buyer shall be given 45 days from acceptance date of offer to have an inspection period [sic] conducted on all or part of the property by an expert of Buyer's choice. This offer is contingent upon Buyer's approval within 45 days from acceptance date of offer of any written or oral reports resulting from said inspections. Seller agrees to give Buyer's agent reasonable access to the property so that the inspections and reports may be completed in the 45 day period.

---

1. The record does not reveal the relationship between Sasaki Saison, Inc. and defendant Gene K.H. Lum or his principal, Shin Investments, Inc.

4. If Buyer notify [sic] escrow and Seller in writing of Buyer's disapproval of any reports during the due diligence period, the contract shall be deemed cancelled and escrow shall return $80,000 to Buyer within 5 days after receipt of said written notification.

5. If no notice of disapproval has been received by escrow and the Seller, Buyer shall deposit an additional non-refundable deposit of $600,000 on or before June 30, 1991 and an additional non-refundable deposit of $25,000 on August 1, 1991, September 1, 1991, October 1, 1991, and November 1, 1991.

On May 9, 1991 Shirley Smith (Shirley), manager for the Kona office of Long & Melone Escrow, Ltd., sent a letter to Lum "requesting information concerning title and tenancy, as that was not specified in the DROA contract." On May 14, 1991 Lum identified Shin Investments, Inc., as the principal in the subject transaction.

The forty-five-day due diligence period expired in the middle of June 1991. On July 29, 1991 James H. Sakoda (Sakoda) wrote a letter to Escrow and sent a copy to Robert L. Smith (Smith), Esq., counsel for Southwest. This letter states in relevant part as follows:

We are legal counsel for [Lum], who is the agent of the Buyer in the Escrow for the purchase of the real property....

Mr. Lum has asked our office to give you, as the Escrow Holder, formal notice that the Buyer is terminating its purchase of the Property based upon the material breach by the Seller of its duty to fully disclose all relevant facts known about the Property to the Buyer. In particular, the Seller failed to fully disclose to Mr. Lum the existence of many archaeological findings on the Property, which would severely limit the Buyer's ability to use the Property and, as a consequence, substantially diminish the value of the Property to the Buyer.

Mr. Lum contracted with ERCE of Hawaii to conduct an archaeological reconnaissance of the Property. ERCE's findings are that:

1. A major archaeological site, consisting of the remains of an ancient Hawaiian Village is situated on the level area near the coastline where the Buyer is planning to develop. The discovery of the Hawaiian Village on this site make[s] it highly unlikely that any facilities could be built on this level area.

2. There are over 112 archaeological findings on the Property, and four to five of these findings are major archaeological sites. These findings would further restrict development of the Property.

\*     \*     \*     \*     \*     \*

ERCE has just delivered the results of their archaeological reconnaissance to Mr. Lum after the expiration of the 45 day Due Diligence Period. Mr. Lum would have terminated the Escrow within the Due Diligence Period if ERCE had completed their reconnaissance within this period. Furthermore, Mr. Lum also would have terminated the Escrow on time if the Seller had fully disclosed the existence of the archaeological findings to the Buyer in its Disclosure Statement....

You are hereby instructed to cancel the Escrow and to return immediately all funds on deposit, minus your cancellation fee, to Shin Investments, Inc. Mr. Lum, as agent for the Buyer, shall contact you upon his return to Hawaii [Hawai'i] and work out arrangements for the refund of the deposit to the Buyer.

In a response letter dated August 1, 1991, Smith asserted in relevant part as follows:

The major premise of your cancellation letter seems to be that our client had a duty to yours to disclose the existence of significant archaeological sites on the property. While I believe it is a correct statement of this rapidly evolving area of the law to assert that a seller of real property in the state of Hawaii [Hawai'i] has an obligation to disclose material defects in the property of which he is aware and which are not readily observable to the buyer, the facts of this case to [sic] not lead to your conclusion that you have a right to cancel the transaction.

Our client is a Kansas corporation composed of two midwestern individuals who purchased the property a few years ago in a commissioner's sale. We have never performed any archaeological surveys of the property or any other studies. We would not recognize a major archaeological site if we stumbled over one. When your client, Gene Lum, an agent for undisclosed principal, bargained for and obtained a due diligence period to perform an archaeological study, we asked that the results of the study be provided to us and your client refused to do so. The due diligence period expired with no word from your client. It is our position that your client's right to cancel this transaction based upon the results of the archaeological study expired with the due diligence period.

After Plaintiffs filed their October 9, 1991 Complaint for breach of contract, Sakoda's November 19, 1991 letter to Smith outlined the findings of the archaeological study that Lum ordered of the Land. It noted that a Preliminary Title Report (PTR) issued by Long & Melone, Ltd., listed "as an encumbrance against the Seller's interest in the Property an 'Archaeological Site within the northwesterly corner of said premises' which was disclosed by a Surveyor's map and an ALTA Surveyor's Report prepared by Wes Thomas and Associates, Inc." Sakoda contended that the listing of the archaeological sites as an encumbrance amounted to a material breach of Sellers' alleged express duty under the Contract to deliver to Lum marketable title free and clear of all encumbrances.

Parts of Rice's April 1, 1992 affidavit are relevant:

3. The subject property, located in Opihi ['Opihi] Hale, extends from Mamalahoa [Mʻamalahoa] Highway to the ocean.

4. The frontage along the Mamalahoa [Mʻamalahoa] Highway is approximately 2,200 feet. The property consists of approximately 265.84 acres.

5. The property was purchased by Southwest Slopes, Inc.[,] in an undeveloped state and remains in an undeveloped state.

6. On or about September 18, 1990 I obtained a preliminary title report listing all liens and encumbrances against the property.

\* \* \* \* \* \*

9. After the due diligence period had expired, Mr. Lum notified the escrow company and your Affiant that there were archaeologically significant sites on the property that he did not learn of until after the due diligence period had expired. My attorney received a letter from James Sakoda, the California attorney acting on behalf of Shin Investments, Inc., Defendant Lum's purported nominee, asserting a right to cancel the contract due to the failure of Southwest Slopes, Inc.[,] to disclose the existence of alleged archaeological sites. . . .

10. I then directed my attorney to prepare a response to Mr. Sakoda's letter advising them of my lack of awareness of any archaeologically significant sites on the subject property. . . .

\* \* \* \* \* \*

12. I am not an archaeologist, have never commissioned an archaeological study of the property, am unaware of any prior archaeological reports and am not trained in the recognition of archaeological sites. At the time that I entered into the contract, . . ., I had no reason to believe that the subject property contained anything that would be considered archaeologically significant.

13. It was my understanding that Mr. Lum would conduct any and all studies he deemed necessary during the due diligence period and that if he found the property unacceptable during the due diligence period he could cancel the contract, but that when the due diligence period expired without notice of cancellation being given, that he was bound to complete the purchase.

## PROCEDURAL HISTORY

On April 9, 1992 Plaintiffs filed a Motion for Partial Summary Judgment on the questions of (1) whether Lum was legally obligated to perform the Contract, and, if so, (2) whether Lum breached the Contract.

The circuit court's May 15, 1992 Order Granting Plaintiff's [sic] Motion for Partial Summary Judgment decided that

[Lum] had no right to cancel the subject contract and is personally liable for breach of the contract between the parties for the reason that [Lum], while indicating in the contract between the parties that he was acting in an agency capacity, did not disclose the identity of the principal, and therefore is personally obligated to perform on said contract, and there is no genuine issue as to any material fact.

Lum filed a motion for reconsideration on May 26, 1992. It was denied on July 27, 1992.

On December 3, 1992 Smith filed a notice that "Plaintiff's [sic] Hearing on Damages will be presented" in the circuit court on Monday, January 25, 1993 at 1:00 p.m. A copy of the notice was served on Lum's counsel by mail.

On December 7, 1992 Lum filed a notice that he "objects to any proof hearing on the issue of damages at this time." Lum did not state any reason for his objection.

On January 25, 1993 the circuit court held a hearing to determine damages. Neither Lum nor his counsel appeared. At the conclusion of the hearing, the court ordered Smith to prepare an order awarding damages but leaving the amount blank, to submit a copy to Lum's counsel, and to provide an affidavit as to attorney fees and costs.

In accordance with Rules of the Circuit Courts Rule 23 (1991), the proposed final judgment was filed on February 4, 1993. It stated in relevant part as follows:

**JUDGMENT IS HEREBY ENTERED** in the above-entitled matter in favor of the Plaintiffs and against the Defendant, Gene K.H. Lum, in the sum of $ ——, together with court costs of ONE HUNDRED SEVENTEEN DOLLARS ($117.00) and Plaintiffs' reasonable attorney's fees in the sum of FOUR THOUSAND SIX HUNDRED TWENTY–FIVE DOLLARS AND THIRTY–SIX CENTS ($4,625.36).

On February 18, 1993 the circuit court filed its Findings of Fact and Conclusions of Law, which stated in relevant part as follows:

### FINDINGS OF FACT

\* \* \* \* \* \*

6. Plaintiffs and Defendant entered into a Deposit, Receipt, Offer and Acceptance contract on or about May 1, 1991 (Plaintiff's Exhibit 1, hereinafter referred to as the "DROA"), for the purchase and sale of the subject real property. . . .

\* \* \* \* \* \*

9. On or about July 29, 1991, Long & Melone Escrow, Ltd. was instructed in writing by counsel for [Lum] to cancel the escrow for the purchase by [Lum] and the sale by [Seller] of the subject property, thereby repudiating the DROA.

10. At the time that the parties entered into the DROA, the parcel identified by Tax Map Key designation (3rd) 8–7–14:6 had a fair market value of ONE MILLION NINE HUNDRED EIGHTY–TWO THOUSAND DOLLARS ($1,982,000.00), and the parcel identified by Tax Map Key designation (3rd) 8–7–14:23 had a fair market value of SEVENTY THOUSAND DOLLARS ($70,000.00).

11. There was no significant change in the market value of the subject property between September 12, 1990 and July 29, 1991.

### CONCLUSIONS OF LAW

\* \* \* \* \* \*

1. [Lum's] instruction to cancel the subject contract (Plaintiffs' Exhibit 3) constituted a repudiation and breach thereof.

\* \* \* \* \* \*

4. The measure of damages for breach of an executory contract for the purchase of land is the difference between the contract price and the fair market value of the property on the date of the breach.

5. Plaintiffs are entitled to damages for breach of contract in the sum of $598,000.

6. Plaintiffs are entitled to costs of court in the sum of ONE HUNDRED SEVENTEEN DOLLARS ($117.00).

7. Plaintiffs are entitled to attorney's fees incurred herein in the sum of FOUR THOUSAND SIX HUNDRED TWENTY–FIVE DOLLARS and THIRTY–SIX CENTS ($4,625.36).

The circuit court filed its Final Judgment against Lum on February 22, 1993.

## DISCUSSION

### A.

█ The Contract became a contract on May 2, 1991. It states that Lum is an "agent[.]" Lum does not dispute that he did not disclose the identity of his principal until May 14, 1991. Since there are no disputes of material fact, the question of whether Lum is personally liable under the Contract is a question of law reviewable by this court applying the right/wrong standard of appellate review. *State v. Miller,* 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983).

█ It is well-established that where a person enters into a contract as agent for an undisclosed or partially disclosed principal, he or she is individually liable on the contract. 3 Am.Jur.2d *Agency* §§ 325, 327 (1986); 2 S. Williston, *A Treatise on the Law of Contracts* §§ 284–85, 288 (3d ed. 1959); *Restatement (Second) of Agency* §§ 4, 320–22 (1958). 3 Am.Jur.2d *Agency* § 327 explains the extent to which an agent must make disclosure of his or her principal in order to avoid personal liability:

In order for an agent to avoid personal liability on a contract negotiated in his principal's behalf, [the agent] must disclose not only that he [or she] is an agent but also the identity of his principal, regardless of whether the [other party] might have known that the agent was acting in a representative capacity. It is not the [other person's] duty to seek out the identity of the principal; rather, the duty to disclose the identity of the principal is on the agent. The disclosure of an agency is not complete for the purpose of relieving the agent from personal liability unless it embraces the name of the principal; without that, the party dealing with the agent may understand that [the agent] intended to pledge his personal liability and responsi-

bility in support of the contract and for its performance.

*Id.* § 327, at 832–833 (footnotes omitted).

█ The *Restatement (Second) of Agency* § 321 discusses the liability of an agent for a partially disclosed principal:

§ 321. Principal Partially Disclosed

Unless otherwise agreed, a person purporting to make a contract with another for a partially disclosed principal is a party to the contract.

Comment:

a. A principal is a partially disclosed principal when, at the time of making the contract in question, the other party thereto has notice that the agent is acting for a principal but has no notice of the principal's identity. See § 4. The fact that, to the knowledge of the agent, the other party does not know the identity of the principal is of great weight in ascribing to the other party the intention to hold the agent liable either solely, or as a surety or copromisor with the principal. The inference of an understanding that the agent is a party to the contract exists unless the agent gives such complete information concerning his principal's identity that he can be readily distinguished. If the other party has no reasonable means of ascertaining the principal, the inference is almost irresistible and prevails in the absence of an agreement to the contrary.

*Restatement (Second) of Agency* § 321, at 70.

Not only the duty of disclosure but the time of disclosure is important. In order to protect the agent from personal liability, it is essential that the principal be disclosed to the third person at the time the transaction is being conducted. On a contract, for example, it is vital that the agent disclose his principal at the time it is made in order to escape personal liability thereon, and the fact that he discloses the identity of his principal after the contract is executed or consummated will not relieve him from liability.

3 Am.Jur.2d *Agency* § 327, at 834 (footnotes omitted).

■ In this case, Lum's disclosure of the identity of his principal, eleven days after the Contract was entered into, came too late to relieve him of liability on the Contract.

The fact that the principal's identity was disclosed before the closing date of the Contract and before the end of the due diligence period is inconsequential. To avoid personal liability, Lum had to have disclosed his principal's identity on or before entering into the Contract. *Van D. Costas, Inc. v. Rosenberg*, 432 So.2d 656, 659 (Fla.App. 2 Dist.1983) ("Subsequent knowledge of the true principal is irrelevant where performance of an indivisible contract has commenced."). "There is no hardship in this rule of liability against agents who do not disclose their principals; they always have it in their power to relieve themselves from such liability, and when they do not, it must be presumed that they intend to be liable." 3 Am.Jur.2d *Agency* § 325, at 831 (footnotes omitted). Therefore, the circuit court was right when it concluded that Lum is personally liable on the Contract.

### B.

Lum contends that, since his counsel's July 29, 1991 letter repudiating the Contract was written for him as agent for Shin Investment, Inc., the circuit court erred in deciding that it was his repudiation. This argument is spurious. Lum is individually liable as a buyer on the Contract in his capacity as the agent for a previously undisclosed principal. Therefore, his repudiation of the Contract in his capacity as agent for his principal is the relevant repudiation.

**2.** Hawai'i Revised Statutes (HRS) § 6E–2 (1985) states that " '[h]istoric property' means any building, structure, object, district, area, or site, including heiau and underwater site, that is significant in the history, architecture, archaeology, or culture of this State, its communities or the nation."

As a result of an amendment in 1990, HRS § 6E–2 (1993) states that " '[h]istoric property' means any building, structure, object, district, area, or site, including heiau and underwater site, which is over fifty years old."

**3.** As a result of an amendment in 1992, HRS § 6E–10 (1993) states as follows:

**Privately owned historic property.** (a) Before any construction, alteration, disposition or im-

### C.

#### *Possible Fraud Upon The Court*

■ The seller's material breach of the contract excuses the buyer's nonperformance. 17A Am.Jur.2d *Contracts* § 664 (1991). Lum's reason for terminating the Contract was Plaintiffs' alleged failure to disclose the existence of major archaeological sites on the Land. These archaeological sites are relevant because HRS § 6E–5.5 (1985) establishes the Hawai'i Historic Places Review Board which "shall ... [o]rder and enter historic properties into the Hawaii [Hawai'i] register of historic places on the basis of their value to Hawaii's [Hawai'i's] heritage[.]" We refer to this register as the Hawai'i Register of Historic Places (HRHP). When a particular historic property [2] is nominated for placement on the HRHP, the owner of the property, consistent with the Hawai'i Administrative Procedure Act, HRS Chapter 91, is notified of the nomination and given the opportunity to contest the nomination in a contested hearing. Hawai'i Administrative Rules chapter 13–198, subchapter 2 (1988). Placement of a historic property in the HRHP subjects the property owner to the obligations and reservations expressed in HRS §§ 6E–10, –11, –12, –14, and –15 and is an encumbrance in favor of the State of Hawai'i Department of Land and Natural Resources.

After a parcel of privately owned real property has been placed on the HRHP, the landowner's right with respect to the property is subject to HRS § 6E–10 (1985),[3] which states in relevant part as follows:

provement of any nature, by, for, or permitted by a private landowner may be commenced which will affect an historic property on the [Hawai'i Register of Historic Places (HRHP)], the landowner shall notify the department [of land and natural resources] of the construction, alteration, disposition, or improvement of any nature and allow the department opportunity for review of the effect of the proposed construction, alteration, disposition, or improvement of any nature on the historic property. The proposed construction, alteration, disposition, or improvement of any nature shall not be commenced, or in the event it has already begun, continue, until the department shall have given its concurrence or ninety days have elapsed. Within ninety days after notification, the department shall:

**Privately owned historic property.** (a) Before any construction, alteration, disposition or improvement of any nature, by, for, or permitted by a private landowner may be commenced which will affect an historic property on the [HRHP], the landowner shall notify the department [of land and natural resources] of the construction, alteration, disposition, or improvement of any nature on the historic property. The proposed construction, alteration, disposition, or improvement of any nature ... shall not be commenced, or in the event it has already begun, continue, until the department shall have given its concurrence or ninety days have elapsed. Within ninety days after notification, the department shall either commence condemnation proceedings for the purchase of the historic property, permit the owner to proceed with the owner's construction, alteration, or improvement, or undertake or permit the investigation, recording, preservation, and salvage of any historical information deemed necessary to preserve Hawaiian history, by any qualified agency for this purpose.

(b) Nothing in this section shall be construed to prevent the ordinary maintenance or repair of any feature in or on an historic property that does not involve a change in design, material, or outer appearance or change in those characteristics which qualified the historic property for entry onto the [HRHP].

Moreover, because of HRS §§ 6E–14, –15 and –42 (1993), the presence of an archaeological site on a parcel of real property is an encumbrance even when the site is not on the HRHP. HRS § 6E–42 states as follows:

(1) Commence condemnation proceedings for the purchase of the historic property if the department and property owner do not agree upon an appropriate course of action;
(2) Permit the owner to proceed with the owner's construction, alteration, or improvement; or
(3) In coordination with the owner, undertake or permit the investigation, recording, preservation, and salvage of any historical information deemed necessary to preserve Hawaiian history, by any qualified agency for this purpose.
(b) Nothing in this section shall be construed to prevent the ordinary maintenance or repair of any feature in or on an historic property that does not involve a change in design, material, or

**Review of proposed projects.** Before any agency or officer of the State or its political subdivisions approves any project involving a permit, license, certificate, land use change, subdivision, or other entitlement for use, which may affect historic property or a burial site, the agency or office shall advise the department and prior to any approval allow the department an opportunity for review and comment on the effect of the proposed project on historic properties or burial sites, consistent with section 6E–43, including those listed in the [HRHP].

■ For purposes of this section only, we take judicial notice of the entire record in Third Circuit Court—Kona Division Civil No. 91–0049K, *Create 21 Chuo, Inc. v. Southwest Slopes, Inc.*, from which Appeal No. 17129 was taken. *State v. Hawaiian Dredging Co.*, 48 Haw. 152, 156, 397 P.2d 593, 597 (1964). *See also Soga v. Jarrett*, 20 Haw. 120, 121–22 (1910). Civil No. 91–0049K is a case involving Southwest's 1990 contract to sell the same 265.84 acres to Create 21 Chuo, Inc. (Create 21). This 1990 contract (Southwest/Create 21 September 14, 1990 Contract) was scheduled for closing on November 30, 1990. The record in Civil No. 91–0049K reveals the following relevant information.

In November 1990, Create 21 retained the services of a consulting firm (Okuhara Consultants) to recommend development possibilities for the property. Create 21 received the report (Okuhara Report) (P.Ex. No. 116 for Identification) from Okuhara Consultants in December 1990. The report stated in relevant part as follows:

outer appearance or change in those characteristics which qualified the historic property for entry onto the [HRHP].
The following part of HRS § 6E–11 (1993), was enacted on July 3, 1990.
**Penalties.**

\* \* \* \* \* \*

(b) It shall be unlawful for any person, natural or corporate, to knowingly take, appropriate, excavate, injure, destroy, or alter any burial site or the contents thereof, located on private lands or lands owned or controlled by the State or any of its political subdivisions, except as permitted by the department [of land and natural resources].

EXECUTIVE SUMMARY

\*  \*  \*  \*  \*  \*

3. The King's Trail passes through the parcel. A[sic] easement where no development can occur would be given to the County or State.

\*  \*  \*  \*  \*  \*

7. An Archaeological Reconnaissance revealed two areas of high density Hawaiian historic and prehistoric Archaeological features; a coastal village complex near Keananulonaha Point and upland agricultural complex at elevations of 1000–1150 ft. Preservation of the coastal Hawaiian village site in its entirety is recommended.

8. There are some patches of resonably [sic] intact native dry forest which might be considered for protection as representative native ecosystems.

\*  \*  \*  \*  \*  \*

## 2.0. ARCHAEOLOGICAL WALK-THROUGH RECONNAISSANCE

\*  \*  \*  \*  \*  \*

### 2.3. *Results*

\*  \*  \*  \*  \*  \*

The zone between 1150–1000 feet elevation (encompassing approximately 30–40 acres) contains numerous archaeological resources. Within this zone are the remains of prehistoric and historic Hawaiian dry-land agriculture. The features that mark this ancient activity include stone mounds, stacked rubble, artificially cleared areas, and stone walls and alignments. The vegetation of this zone, including feral ti (*Cordyline fruticosa*) and "wild" yams (*Dioscorea bulbifera*) among other secondary (historic) growth, corroborates the interpretation of sites associated with Hawaiian agriculture. This zone contains a relatively high-density of archaeological sites/features, and appears to be part of the extensive Kona Field System (Kelly 1983; Newman 1970). The Kona Field System is an expansive and very significant archaeological site complex, and is listed on the [HRHP] (Site 10–37–6601).

\*  \*  \*  \*  \*  \*

The coastal lands below the Pali on the parcel (less than 200–120 feet elevation) contain numerous archaeological sites. Within the coastal lands are the remains of settlements (residential complexes with terraces, house platforms, walled enclosures, midden, historic and prehistoric artifacts), petroglyphs (rock art), a possible religious site (*heiau*), trails (historic and prehistoric), and cairns (*ahu*). These sites appear to be clustered directly adjacent to the coast at Kalaepa'akai Point. Areas to the south on the parcel, where the sea cliffs are substantially higher, do not appear to have archaeological sites. Similarly, areas on the coastal lands about 300–500 feet inland of the shoreline and on some of the a'a lava flow, appear to have little in the way of archaeological remains. The archaeological remains on the coastal lands are in an excellent state of preservation and are highly significant in terms of their research, cultural and interpretive potentials.

In short, two zones contain most of the archaeological resources on the parcel—the upland agricultural sites and the coastal settlement. . . . These sites meet several criteria for significance in legal terms.

Create 21's real estate agent was International Realty Corporation (IRC), which was owned by Steven Dixon (Steven). IRC's principal broker was Lucy Dixon (Lucy). By letter dated December 7, 1990, Create 21 informed Steven that it was cancelling the Southwest/Create 21 September 14, 1990 Contract because of the information in the Okuhara Report. A copy of the relevant pages of the Okuhara Report was attached to the letter. Lucy informed Smith of the December 7, 1990 letter and attachment. When Smith deposed Lucy, he asked and she answered in relevant part as follows:

Q. . . . Do you recall contacting me following your receipt of that letter to advise me that your clients were not intending to go through with the purchase of the property?

A. Yes.

Q. Do you recall telling me that the reason was that they had discovered the

existence of archaeological sites on the property?

Q. Yes.

Q. And also that there was a field of yams on the property?

A. Yes.

Deposition of Lucy Dixon taken on behalf of Southwest on December 4, 1991, at p. 82.

It appears that the Southwest/Lum May 2, 1991 Contract was entered into after Lucy informed Smith of the existence on the property of archaeological sites, including a site that "appears to be a part of the extensive Kona Field System" that is listed on the HRHP. However, in his August 1, 1991 letter responding to Sakoda's July 29, 1991 cancellation letter, Smith wrote in relevant part as follows:

> While I believe it is a correct statement of this rapidly evolving area of the law to assert that a seller of real property in the state of Hawaii [Hawai'i] has an obligation to disclose material defects in the property of which he is aware and which are not readily observable to the buyer, the facts of this case to [sic] not lead to your conclusion that you have a right to cancel the transaction.

> Our client is a Kansas corporation composed of two midwestern individuals who purchased the property a few years ago in a commissioner's sale. We have never performed any archeological surveys of the property or any other studies. We would not recognize a major archaeological site if we stumbled over one....

> It is probable that the revelation of the archelological [sic] findings diminishes the value of the property. Nevertheless, we believe that we are entitled to the benefit of our bargain; that is, the difference between the price that your client agreed to pay and the fair market value of the property, taking into consideration the archeological findings....

Similarly, in his April 1, 1992 affidavit filed on April 9, 1992, Rice stated in relevant part as follows:

> 9. After the due diligence period had expired [in June 1991], Mr. Lum notified the escrow company and your Affiant that there were archeologically significant sites on the property that he did not learn of until after the due diligence period had expired. My attorney received a [July 29, 1991] letter from ... Lum's purported nominee, asserting a right to cancel the contract due to the failure of Southwest Slopes, Inc.[,] to disclose the existence of alleged archeological sites....

> 10. I then directed my attorney to prepare a response ... advising them of my lack of awareness of any archeologically significant sites on the subject property....

> *    *    *    *    *    *

> 12. I am not an archeologist, have never commissioned an archeological study of the property, am unaware of any prior archeological reports and am not trained in the recognition of archeological sites. At the time that I entered into the [May 2, 1991] contract, ..., I had no reason to believe that the subject property contained anything that would be considered archeologically significant.

In light of the information communicated by Create 21's December 7, 1990 letter cancelling the Southwest/Create 21 September 14, 1990 Contract and by Lucy's subsequent conversation with Smith, the above affidavits by Smith and Rice appear to be no less than misrepresentations. We refer this possible fraud upon the court to the circuit court for appropriate investigation and action.

■ The possibility that Plaintiffs used fraud upon the court when obtaining the summary judgment in their favor motivates us to vacate and remand. "Fraud, misrepresentation, and circumvention used to obtain a judgment are generally regarded as sufficient cause for the opening or vacating of the judgment[.]"  47 Am.Jur.2d *Judgments* § 831 (1995).

## CONCLUSION

Accordingly, we vacate the February 22, 1993 Judgment and remand for further proceedings in accordance with this opinion.